2019 IL App (3d) 170370

Opinion filed October 9, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, Hancock County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0370 Circuit No. 14-CF-41 |
| ROGER D. TONDINI II, | ) ) | Honorable Rodney G. Clark, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE SCHMIDT delivered the judgment of the court, with opinion.
Justices Carter and McDade concurred in the judgment and opinion.

**OPINION**

¶ 1        The State charged defendant, Roger D. Tondini II, with three counts of aggravated battery. 720 ILCS 5/12-3.05(a)(1), (c)(1), (f)(1) (West 2014). Before trial, defendant filed a motion to qualify an expert witness, which the trial court denied. The case proceeded to *voir dire*. Defendant's attorney made a challenge for cause to remove juror James Little, asserting his wife Sandy Little was an employee of the Hancock County State's Attorney's office prosecuting defendant's case; therefore, James was presumed biased. The trial court denied the challenge. Defendant's attorney subsequently used his last preemptory challenge to remove juror Harry Douglas. At trial, the jury found defendant guilty of aggravated battery. Defendant filed a motion

for judgment notwithstanding the verdict (judgment *n.o.v.*) and motion for a new trial, arguing that the trial court abused its discretion in denying his challenge for cause and motion to qualify an expert witness. The court denied the motion. Defendant appeals. We affirm.

¶ 2                                                    I. FACTS

¶ 3        The State charged defendant with three counts of aggravated battery following a fight during which he stabbed Amanda Delgado. He asserted the affirmative defense of self-defense and sought by motion to qualify Marc MacYoung as an expert trial witness "to deal with issues concerning use of force." Defendant attached to the motion a copy of MacYoung's resume detailing his training and experience. MacYoung's resume purported that he had worked on multiple court cases as a knife and violence reconstruction expert. In particular, MacYoung listed "*Illinois v. R.D. Tondini 2014* (Knife, violence reconstruction)". In addition, he claimed to have authored several books and articles on the subjects of self-defense, martial arts, and violence, performed in multiple instructional videos on street knife fighting and self-defense, made various radio and television appearances, and taught multiple seminars on martial arts and "violence dynamics."

¶ 4        At the hearing on the motion, MacYoung testified that he teaches "violence dynamics" in which people learn the parameters of self-defense such as how to recognize threats, recognize patterns, use appropriate force, and deal with the aftermath. He also teaches police officers the professional use of force and how to control subjects without causing injuries. He instructs the military how to neutralize opponents. When he assesses court cases, "what I do is I'll review the case, I take all the evidence that is presented to me, and I try to assess what is most likely to have occurred. *** And I compare those with established patterns of violence that I look at and go,

- 2 -

okay, was this self-defense or not? And if—if it is not self-defense, I will generally turn the case down."

¶ 5        He stated that violence dynamics is not accredited by any university. Despite claiming he instructed both civilians and professionals in the use of force, he averred that teaching people how to handle violence cannot be taught in academia because it is difficult to simulate placing someone in danger. He worked in security and at a correctional facility. He admitted that violence dynamics is not a scientific field and he received his expertise in the matter through personal experience, *i.e.*, witnessing violent altercations as a young child, personal experience, and reading multiple sources on related topics. He stated that "most people are really either misinformed or just flat-out ignorant about how violence happens, especially professional criminal violence." He admitted that he could not "speak to the mindset of any individual involved in this situation" or know what any person believed or felt at the time of the incident.

¶ 6        He did not have a college degree but had attended two community colleges. MacYoung had never been a police officer and had never received training at a police academy. He has no education in sociology, psychology, or biomechanics, and did not know whether his expertise was generally accepted in those areas. He also confirmed that he was not a medical doctor or an expert in deception. MacYoung and two other individuals created violence dynamics as a field of study. He denied being an "expert" but explained that he and his cohorts were "knowledgeable" on the topic and were continuing to do research in the area.

¶ 7        The trial court denied the motion, determining that:

> "[I]n the instant case Mr. MacYoung can point to no source by which he obtained information regarding violence dynamics. His highest level of completed education is a high school diploma. He

- 3 -

had no post high school studies in the area of violence dynamics and appears to have, from his testimony, developed the theory. At one point he indicated that he had developed it by a solo study in the 1970's [*sic*]. He then later indicated that the theory of violence dynamics was created in conjunction with two colleagues. \*\*\* In creating the theory to which he proposed to testify, he considered no scientific reports or studies. The theory's [*sic*] never been subject to peer review or accepted in a scientific community.

\*\*\* And the motion to qualify Mr. MacYoung as an expert in the case is denied."

¶ 8 Defendant filed a motion to reconsider, claiming that MacYoung's opinion was not a scientific methodology or principle and, therefore, the trial court improperly relied on its conclusions that MacYoung's expertise had not been subject to peer review or accepted in a scientific community. At the hearing on the motion to reconsider, the following exchange occurred:

"THE COURT: I noticed you mentioned Frye. And Frye applies only to a scientific principle, process or technique, or test applying the principle. And didn't Mr. MacYoung indicate several times while he was testifying that his testimony was not scientific?

MR. WOODWORTH [(DEFENDANT'S ATTORNEY)]: Correct. Yes, he did.

THE COURT: So Frye doesn't really apply.

MR. WOODWORTH: That's our position. The Frye standard does not apply, that's correct.

THE COURT: And I didn't—I don't remember citing Frye because there was no indication that there was any scientific evidence that was going to be offered."

¶ 9 Ultimately, the trial court denied the motion to reconsider. Specifically, it held:

"There's nothing in the—either Mr. MacYoung's opinion or the Motion to Reconsider that indicates how his testimony would help the trier of fact.

He was asked several times if he was going to offer an opinion as a self-defense expert, and he indicated every time that he was not offering an opinion as a self-defense expert. *** And he had taught a—or run a business for years as a self-defense instructor, but he indicated several times that he would not be offering an opinion on self-defense; that he would be offering an opinion on—at one point he called it violence dynamics and at the other time he referred to it, I think, as violence reconstruction.

And in his CV he's listed Mr. Tondini's case as part of his prior experience and indicates that he *** offered an opinion on knife and violence reconstruction. So I take it at his word that his opinion was going to be on knife and/or violence reconstruction and that those are theories that he developed. *** [T]he theory of violence dynamics, which he offered to testify about, is not

recognized anywhere. He was qualified as an expert in knife wounds, I believe it was, in the state of California sometime previously. *** He indicated on several occasions that he would not be offering opinion on either the martial arts or self-defense.

And it's indicated that he had extensive training and firsthand experience in gang-related violence. And as I recall, his testimony was that he grew up in a rough part of Los Angeles; that his last actual fight was when he was 19 years of age. ***

There's no indication that he is an expert in gang-related violence, and he didn't indicate that he would be testifying to that effect either. So based on those recollections and analysis, the Motion to Reconsider is denied."

¶ 10 Thereafter, the case proceeded to *voir dire*. Juror James Little stated that he knew Hancock County State's Attorney Jason Pohren, the prosecutor in defendant's case. When asked how he knew Pohren, James responded that his wife worked for the State's Attorney's office. The court inquired if James's wife was Sandy Little; James responded yes. The court asked James the following questions to which he responded "no": (1) whether Sandy's employment would prevent him from being fair and impartial at trial; (2) whether Sandy had discussed the case with him; and (3) whether either party would receive an advantage from his presence on the jury. The court also queried whether James could listen to the evidence presented and decide the case based on the law that was given; he responded "yes." Defense counsel asked James if he would feel uncomfortable explaining his reasoning if he found defendant not guilty; he

responded "no." James stated that he goes into the State's Attorney's office twice a month. He also stated that he had not heard any description of the events in the case.

¶ 11 Thereafter, the court informed the parties on their remaining peremptory challenges—the State had two and defendant had one—and asked if they wished to exercise any challenges:

"MR. WOODWORTH [(DEFENDANT'S ATTORNEY)]: Judge, I would make a motion for cause in regards to Mr. Little. I believe there's a clear appearance of impropriety in that situation. Mr. Little's in the State's Attorney's Office two times a month; his wife works in the State's Attorney's Office. He seemed real hesitant when the Court first questioned him. I realize that he answered the questions of the Court okay, but I just think there's an appearance of impropriety there. I'm making a motion for cause on him.

THE COURT: Argument?

MR. POHREN [(STATE'S ATTORNEY)]: Your Honor, in this case he indicated that he'd be able to set aside anything. He hasn't heard any facts. He's just like any other witness in the case.

THE COURT: I'm going to deny for cause."

Ultimately, defendant used his final peremptory challenge to remove Harry Douglas, a former State Police employee, from the jury. He did not thereafter raise the issue of striking Little for cause or ask for additional peremptory challenges.

¶ 12 The case proceeded to trial. The jury found defendant guilty on two of the three counts of aggravated battery. Defendant filed a motion for judgment *n.o.v.* and a motion for a new trial,

arguing, *inter alia*, that (1) the trial court's refusal to strike James for cause was an abuse of discretion because James and Sandy's relationship creates presumed biased and (2) the trial court's denial of defendant's motion to qualify expert witness was an abuse of discretion because defendant was not allowed to present his theory of defense at trial. The trial court denied the motion and sentenced defendant to probation.

¶ 13                                    II. ANALYSIS

¶ 14                          A. For-Cause Challenge to Juror

¶ 15        Defendant argues that the trial court violated his sixth amendment right to a fair trial when it did not strike James Little from the jury. Citing *People v. Cole*, 54 Ill. 2d 401 (1973), he claims that a juror is presumed to be biased when a juror and a party to the litigation are related. Defendant argues that the court here should have presumed James biased because (1) James's wife Sandy Little was employed as the victim witness coordinator for the same State's Attorney's office that was prosecuting defendant in the present case, (2) James knew the prosecutor assigned to defendant's case, (3) James visited the State's Attorney's office at least twice a month, (3) the trial judge knew Sandy, (4) Sandy remained in the courtroom during the trial, (5) Sandy handed papers to the prosecutor during the trial, and (6) Sandy sat about 15 feet away from James during the trial. Defendant alleges that James and Sandy's marital relationship and Sandy's involvement at the trial suggests that James's opinion would carry greater weight during deliberations. Additionally, because of James's relationship with Sandy, he would feel pressure to find defendant guilty.

¶ 16        The State argues defendant waived this issue on appeal because he did not state that he was being forced to accept an objectionable juror. Also, the State asserts that James was not presumed biased because Sandy was not a party to the trial nor did she "assist" the prosecution

during trial. The State further alleges defendant cannot point to any evidence of bias. All of his allegations regarding the trial judge's and jurors' knowledge are speculative.

¶ 17    The right to an impartial jury is so fundamental to due process that any infringement of that right requires reversal by a reviewing court. *People v. Boston*, 271 Ill. App. 3d 358, 360 (1995). The purpose of *voir dire* is to eliminate prospective jurors who are not impartial. *Id.* Our supreme court in *Cole* stated that "there are certain relationships which may exist between a juror and a party to the litigation which are so direct that a juror possessing the same will be presumed to be biased and therefore disqualified." *Cole*, 54 Ill. 2d at 413. However, "[b]eyond these situations which raise a presumption of partiality," impartiality is not a technical concept but, rather, it is a state of mind. *Id.* More specifically, a person is not competent to sit as a juror if his/her state of mind is such that with him/her as a member of the jury, a party will not receive a fair and impartial trial. *Id.*

¶ 18    The burden of showing that a juror is partial rests on the party challenging the juror; more than a mere suspicion of bias must be demonstrated. *Id.* at 360-61. A court's failure to remove a juror for cause is grounds for reversal only if the defense exercised all of its peremptory challenges and an objectionable juror was allowed to sit on the jury. *People v. Lake*, 298 Ill. App. 3d 50, 56 (1998). A defendant shows that an "objectionable juror" was forced upon him after he exhausted his peremptory challenges when there was "some attempt to persuade the trial judge that a juror the defendant was required to accept could not be fair and impartial." *People v. Reid*, 272 Ill. App. 3d 301, 309 (1995). The determination whether to allow a challenge for cause lies within the sound discretion of the circuit court; it will not be disturbed absent an abuse of discretion. *People v. Taylor*, 166 Ill. 2d 414, 422 (1995). A trial court abuses its discretion when

its ruling is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *People v. Hernandez*, 319 Ill. App. 3d 520, 526 (2001).

¶ 19 Looking first at whether there was a presumption of bias, we cannot conclude that Sandy was a party to the action. The parties do not cite any authority, nor do we find any that qualifies a nonprosecutorial employee of the State's Attorney's office as a party in a criminal case. Moreover, other Illinois courts have defined a party as "one who has a right to control the proceedings, to pursue a defense, to call and cross-examine witnesses, and to appeal from the decision." *General Auto Service Station, LLC v. Garrett*, 2016 IL App (1st) 151924, ¶ 21. Based on this definition, Sandy is not a party. She does not have the right to control the proceedings, pursue a defense, call and cross-examine witnesses, or appeal the jury's verdict. We find that Sandy's role in the State's Attorney's office does not qualify her as a party to this case and, therefore, hold that there is no presumed bias.

¶ 20 Though she was not a party, Sandy was a participant in the proceedings and an active presence in the courtroom during trial. Therefore, we look beyond the presumption to consider whether defendant should prevail on this claim for a different reason. Defendant cannot argue that we are required to reverse because he failed to indicate to the trial court that he was forced to accept an objectionable juror and thus preserve the issue. Similar to this case, in *People v. Washington*, 104 Ill. App. 3d 386, 392 (1982), the First District determined that the defendant did not indicate that he was being forced to accept an objectionable juror after the trial court overruled the challenge for cause. The appellate court stated that "[n]otifying the trial court of this fact would have served the salutary purpose of giving the court a final opportunity to cure the alleged error by exercising its inherent power to grant the defense an extra peremptory

challenge." *Id.* Therefore, the *Washington* court found that the defendant had waived the issue. *Id.*

¶ 21    Here, defense counsel challenged James seeking to remove him for cause, which the trial court denied. Defense counsel then used defendant's last peremptory challenge to remove Harry Douglas, not James. After defense counsel removed Douglas, he made no further argument with respect to James. He made neither a request that the court reconsider the denial of the challenge for cause nor a request for an additional preemptory challenge, reiterating his belief that James could not be impartial, and asserting he was being forced to take an objectionable juror. Moreover, defendant had not exercised all of his preemptory challenges at the time the trial court denied his challenge for cause. Therefore, we find defendant waived this issue.

¶ 22                                    B. Expert Witness

¶ 23    Defendant next claims that the trial court abused its discretion when it denied his motion to qualify Mark MacYoung as an expert. He argues that the trial court improperly considered MacYoung's opinion as scientific under the *Frye* test. *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Defendant contends that, instead, the trial court should have based its determination on whether MacYoung had knowledge and experience beyond the average citizen and whether MacYoung's opinion would assist the jury in evaluating the evidence in accordance with *People v. Atherton*, 406 Ill. App. 3d 598, 614 (2010). Relying on *Atherton*, defendant asserts that MacYoung's knowledge exceeds that of the average citizen because (1) he trains police officers, (2) he has previously testified about self-defense at trial, (3) he teaches civilians and professionals self-defense, and (4) he has published literature on self-defense. Moreover, defendant maintains that MacYoung's testimony would assist the jury in evaluating the evidence because MacYoung would give greater context to the number of individuals involved in the

- 11 -

altercation, alcohol's role in the altercation, the size and reach of the individuals involved, and the weapons used in the altercation. Without the court's certification, defendant did not have an opportunity to present a defense. Defendant analogizes MacYoung to a narcotics expert because narcotics police officers have been qualified as experts although their opinion is not scientific.

¶ 24     The State claims that the trial court acknowledged that the *Frye* test did not apply to this case in its consideration of defendant's motion to reconsider and, therefore, defendant's argument that the trial court applied the wrong test is without merit. Also, the State argues that MacYoung's testimony would amount to profile testimony regarding general observations about violence without being able to speak to the specific circumstances surrounding defendant's case.

¶ 25     We agree with the State to the extent that defendant's argument regarding the *Frye* test is without merit. Furthermore, we may affirm for any reason apparent on the record, regardless of the lower court's reasoning. *Razavi v. School of the Art Institute of Chicago*, 2018 IL App (1st) 171409, ¶ 41. We must still determine whether the court abused its discretion in denying defendant's motion to qualify MacYoung as an expert. See *In re Commitment of Field*, 349 Ill. App. 3d 830, 831 (2004) (holding that an expert's opinion, if not scientific, is still subject to the general test of admissibility).

¶ 26     It is well settled that the decision whether to admit expert testimony is within the sound discretion of the trial court. *Snelson v. Kamm*, 204 Ill. 2d 1, 35 (2003). A person will be allowed to testify as an expert if his experience and qualifications afford him knowledge that is not common to laypersons. *People v. Miller*, 173 Ill. 2d 167, 186 (1996), *abrogated on other grounds*, *In re Commitment of Simons*, 213 Ill. 2d 523, 530-31 (2004). A person seeking to offer a nonscientific opinion can be permitted to testify as an expert as long as that person's knowledge, skill, experience, training, or education affords him or her information that is not

- 12 -

common to the average layperson *and* will assist the jury in evaluating the evidence and reaching a conclusion. *People v. Lovejoy*, 235 Ill. 2d 97, 125 (2009). An expert's testimony will assist the jury when his or her testimony offers knowledge and experience that a juror generally lacks. *People v. Mertz*, 218 Ill. 2d 1, 72 (2005). "Formal academic training or specific degrees are not required to qualify a person as an expert; practical experience in a field may serve just as well to qualify him." *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 459 (1992).

¶ 27 Despite the considerations discussed above, the court should exclude profile testimony that describes common practices, habits, or characteristics that are not in any way connected to the defendant or his circumstances. *People v. Brown*, 232 Ill. App. 3d 885, 898 (1992). In *Brown*, an officer testified to establish the street value of drugs recovered from defendant. *Id.* He also testified regarding "common practices, habits, or characteristics of drug [dealers]." *Id.* The reviewing court classified these statements as profile testimony not in any way connected to the specific circumstances surrounding the defendant's arrest. *Id.* The court remanded for a new trial based on the admission of the profile testimony. *Id.* Similarly here, MacYoung did not purport to know anything about what happened the night in question. MacYoung was going to explain to the jury how violence works by addressing the synergistic effect of the number of individuals involved in the altercation, the role of alcohol, the size and reach of the individuals involved, the weapons used, and the impact of these factors on the nature and legitimacy of defendant's thought process. It escapes this court how MacYoung could offer an opinion on these factors when he was not present for the altercation. Accordingly MacYoung could not testify that defendant stabbed the victim in self-defense.

¶ 28 Whether a defendant was entitled to use deadly force is circumstance-specific. *People v. Holman*, 2014 IL App (3d) 120905, ¶ 58. "The decisive question is whether the defendant's

belief that it was necessary to use deadly force was reasonable under the circumstances." *Id.* Defendant does not rebut the State's argument that MacYoung's testimony would amount to profile evidence. Instead, he attempts to analogize it to an officer testifying about narcotics. He ignores that an officer, when testifying in regard to narcotics, has met at least the minimum training standards to enable him to speak about identifying drugs, determining the street value of drugs, and explaining the differences between drug users and drug dealers. None of these subjects amount to profile testimony "describing common practices, habits, or characteristics that are not in any way connected to the defendant or his circumstances." *People v. Robinson*, 391 Ill. App. 3d 822, 837 (2009). MacYoung admitted that he did not have first-hand knowledge of the altercation that led to defendant's charges. He denied being able to offer an opinion on martial arts or self-defense but was unable to describe violence dynamics without the use of these concepts. He could not speak to defendant's mindset, beliefs, or feelings at the time of the incident. Defendant sought to admit MacYoung to instruct the jury on violence generally but not the attendant circumstances surrounding defendant's acts. As such, the trial court did not abuse its discretion in denying defendant's motion to qualify MacYoung as an expert witness.

¶ 29                                               III. CONCLUSION

¶ 30        For the foregoing reasons, we affirm the judgment of the circuit court of Hancock County.

¶ 31        Affirmed.