2020 IL App (2d) 190533-U
No. 2-19-0533
Order filed September 22, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-880 |
| GREGORY C. DACANAY, | ) ) | Honorable Liam C. Brennan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Jorgensen and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in (1) denying defendant's motion to excuse certain jurors for cause, (2) granting the State's motion to amend the indictment to remove unnecessary allegations, (3) denying defendant's motion to suppress statements he made during a recorded interview, and (4) admitting photographs of Snapchat conversations into evidence.

¶ 2    Following a jury trial, defendant, Gregory C. Dacanay, was convicted of one count of aggravated criminal sexual abuse. On this direct appeal, defendant contends that the trial court (1) deprived him of a fair trial by not excusing certain jurors for cause, (2) violated his due process rights when it granted the State's motion to amend the language in the indictment the day of trial,

(3) erroneously denied his motion to suppress statements made in a recorded interview, and (4) erred by admitting certain photographs into evidence. For the reasons that follow, we affirm defendant's conviction.

¶ 3                                    I. BACKGROUND

¶ 4     The following was adduced at trial. In April 2018, defendant, then 42 years old, was employed as a personal trainer/manager at a fitness facility in Glen Ellyn. The then 16-year-old victim, G.M., was employed part-time at the same facility, working at the front desk. G.M. alleged that on April 14, 2018, defendant asked him to help move some things in a small, second-floor trainer locker room. After the two entered the locker room and the door shut behind them, defendant turned off the lights and began rubbing G.M.'s chest and kissing his neck. Defendant then pulled down his sweatpants, removed his erect penis, took G.M.'s hand and placed it on his penis. After that, defendant unbuckled G.M.'s belt buckle, pulled down G.M.'s pants and underwear to his ankles, and performed oral sex on G.M. Eventually, G.M. stepped away from defendant and pulled up his pants. Defendant then told G.M. not to tell anyone what had happened or he would go to prison and that he was ashamed of his behavior; defendant also spoke about his wife and children.

¶ 5     The next day G.M. told his parents about the incident, and they called the police. The responding officer took G.M.'s statements, and on April 16 the case was assigned to Vince Liberio, an investigator with the Du Page County State's Attorney's Children's Center. Liberio and his partner, Kathy Hundley, interviewed G.M. and his mother regarding the incident and formulated a plan to contact defendant through Snapchat, a social media application that allows for its users to send picture, video, or text messages to other users, which are available only for a limited time before becoming inaccessible.

¶ 6    On April 18, G.M. and his mother returned to the Children's Center with G.M.'s phone to begin exchanging Snapchat messages with defendant. Liberio explained to G.M. what the messages should convey but instructed G.M. to put the messages in his own words. Due to the ephemeral nature of the messages, Liberio took pictures of the messages on the phone as they were sent or received. The following is the exchange of messages between G.M. and defendant from about 4:00 p.m. to 5:30 p.m. under Liberio's instruction:

"G.M.: hey

are you there

DEFENDANT: Hey

G.M.: ryan asked to take my shift on Saturday

DEFENDANT: Ok treadmills are being delivered late tonight u gonna workout

G.M.: not sure yet but i'm still confused about what happened on Saturday

DEFENDANT: Oh

Im here late night if u need anything

G.M.: i can't tonight

DEFENDANT: Ok let me know if something changes

G.M.: you said that it was hard on you but it's also hard on me rn [right now]

DEFENDANT: Should I vanish?

G.M.: no i'm just nervous

DEFENDANT: About?

G.M. if it's gonna happen again

DEFENDANT: It doesn't have to

G.M.: i just haven't had anybody do that to me before

i don't know how to feel yet

DEFENDANT: Oh

Was it good

G.M.: i'm not sure

did you cum

DEFENDANT: I guess it was bad

Wat was ur question?

G.M.: i asked did you cum

DEFENDANT: Lol really?

G.M.: i don't know if it was good that was my first time getting a bj [blow job]

DEFENDANT: Getting or giving.

G.M.: getting

DEFENDANT: Oh

U got a lot of homework

G.M.: some

what do you mean

DEFENDANT: Im confused what?

G.M. what homework are you talking about

DEFENDANT: Idk. Thought u couldn't work out cause u had alot of Homework

G.M.: i have some but i just wanted to talk about saturday

DEFENDANT: Ok

I can vanish

G.M.: i have to go i'll talk to you later"

Liberio directed G.M. to inform the investigators if defendant attempted any further conversation via Snapchat and directed him to not respond to any such communication. They planned to resume messaging defendant the next afternoon.

¶ 7    The next morning, Liberio was informed that defendant messaged G.M. at some point in time during the evening. Liberio went to G.M.'s home to view the message, which stated "U awake." That afternoon, G.M. and his mother returned to the Children's Center to resume messaging defendant on Snapchat, which Liberio again documented by photograph. This time, however, Liberio took over the phone and exchanged messages with defendant, posing as G.M. The following exchange took place over the course of two hours:

> "G.M.: how late did you end up staying there last night
>
> hey are you there
>
> DEFENDANT: 338am. Dying [accompanied by a bitmoji picture]
>
> LIBERIO [as G.M.]: i couldn't sleep either
>
> have you been thinking about giving me another blowjob
>
> DEFENDANT: Ha maybeereeeee
>
> U?"

That text message was accompanied by picture message of defendant's penis. The conversation continued:

> "LIBERIO [as G.M.]: is that yours
>
> ?
>
> DEFENDANT: Have you thought about it
>
> LIBERIO [as G.M.]: yeah but i'm nervous because you said something about getting in trouble…am i gonna get in trouble because i'm 16?

DEFENDANT: Naw r u trying to get me in trouble

LIBERIO [as G.M.]: nooo i thought you said i would get in trouble that's why i was scared

DEFENDANT: U won't get in trouble

Lol

u want me to vanish

LIBERIO [as G.M.]: no just freaking a little but ok

DEFENDANT: Lol. Ur fine.

U want it again

?

Wait so shud i vanish?

LIBERIO [as G.M.]: you'll give me another blowjob?

DEFENDANT: U have to b more discreet when u chat. Lol

LIBERIO [as G.M.]: ok sorry

DEFENDANT: U gonna work out today

LIBERIO [as G.M.]: gotta go mom is calling me. later"

¶ 8    The next morning, Liberio, Hundley, and a Glen Ellyn police officer went to the fitness facility to locate defendant. Liberio approached defendant, identified himself as an investigator, and asked defendant if he would come to the police station to speak to him about an ongoing investigation. Defendant complied and rode with Liberio and Hundley in an unmarked car the few blocks to the police station. Once there, defendant was led to an interview room located next to the lobby. Liberio then read the *Miranda* warnings to defendant before beginning the interview. During the interview, defendant denied that anything sexual happened between him and G.M. but

admitted to sending certain Snapchat messages to G.M., including the picture message of his penis. About an hour and fifty minutes into the interview, defendant stated, "I need an attorney in front of me," and the interview ceased. Defendant was then arrested.

¶ 9    The April 20 complaint listed two counts of aggravated criminal sexual abuse. The first count alleged "sexual penetration *** in that the defendant placed his mouth on the penis of G.M." The second count alleged "sexual conduct *** in that the *defendant placed G.M.'s hand on defendant's penis*[.]" (Emphasis added.) On May 8, 2018, the grand jury issued its indictment, which also noted two counts but changed the order of the charges and the wording from the complaint. First, "defendant knowingly committed an act of sexual conduct with G.M., *** in that the *defendant touched G.M.'s sex organ* for the purpose of sexual gratification or arousal of G.M. or the defendant" and second, "defendant knowingly committed an act of sexual penetration with G.M., *** in that the defendant's mouth touched G.M.'s sex organ for the purpose of sexual gratification or arousal of G.M. or the defendant[.]" (Emphasis added.)

¶ 10    Defendant filed a motion to suppress the statements he made about the Snapchat messages during the interview. The trial court denied that motion, finding that defendant made voluntary statements and reinitiated conversation with the investigators after asking if he should have his lawyer present about an hour into the interview (the record does not contain a complete transcript of the hearing but does include the court's reasoning in denying the motion). Defendant also filed a motion to bar certain evidence and testimony at trial. The motion was granted in part but denied with respect to (1) a previous instance where defendant sent a picture of his penis to G.M., (2) video evidence from the fitness facility on the day of the incident, and (3) the photographs of the Snapchat messages.

¶ 11    On the day of trial, before the jury selection began, the State sought to strike the phrase "for the purpose of sexual gratification or arousal" in count II (penetration) of the indictment. Defendant did not object, and the motion was granted.

¶ 12    Jury selection lasted a full day with each of the potential jurors being thoroughly questioned about their ability to be impartial by the trial court, the State, and defendant's counsel. The court ultimately excused seven jurors for cause. Defense counsel used all seven of the allotted peremptory challenges and requested that the court grant him additional peremptory challenges. Although the court noted that it had discretion to do so, it did not grant defendant's requests.

¶ 13    Relevant to his argument on appeal, defendant moved to excuse two jurors for cause. The first, Juror 15, cried when recalling how she witnessed the sexual assault of a friend. In denying defendant's motion, the trial court stated "She did become emotional when it related to a sexual assault of another person that she said she witnessed, but she also indicated that she believed that she could be fair, and I don't believe it is a basis to excuse her for cause." Defendant used his final peremptory challenge to remove her from the panel.

¶ 14    The second, Juror 94, was employed as a police officer in a neighboring county. After hearing argument as to why the juror should be excused for cause, the trial court denied defendant's motion:

> "[H]e clearly answered every single question asked, whether by the Court or by the State or some vigorous questioning on [defendant's] behalf as well, entirely appropriately. The suggestion is that as a police officer, he knows what to say,*** he can't possibly mean it or be fair. But, quite frankly his demeanor *** and his answers don't lead me to believe he's being anything about [*sic*] truthful, and, frankly, I have had police officers tell me that they couldn't be fair in the past."

The court also denied defendant's motion for an additional peremptory challenge to Juror 94: "[i]f the officer had made any suggestion whatsoever that was problematic and yet not approaching cause, I might exercise the digression, [*sic*] but there's been not even a hint of anything inappropriate."

¶ 15    Finally, defense counsel noted that defendant asked him to withdraw a third motion for cause to dismiss Juror 78 who knew Investigator Hundley:

> "MR. MIGLORE [DEFENSE ATTORNEY]: Yeah, he does know her, but he says he can judge the case fairly. At this point in time, I'm not going to make a motion for cause. I just -- we have considered -- my client asked me to withdraw it.
>
> THE COURT: That's fair. I think I would also point out that he kept calling her Ms. Hundley, not Kathy. I think there's relationship because he coached her kids at a certain point, but I would -- I didn't see anything that rose anywhere near --
>
> MR. MIGLORE: Me neither.
>
> THE COURT: Very good."

The trial the next day.

¶ 16    The State presented its case in chief with both G.M. and Liberio testifying as to the facts detailed above, playing clips from the recorded interview, and introducing the photographs of the Snapchat messages into evidence. On cross-examination, G.M. admitted that he was not sure if defendant placed his penis in G.M.'s left or right hand first and reiterated that defendant's penis was erect. After the State rested, defense counsel moved for a directed finding. Defense counsel argued that, with respect to the first count (sexual conduct), G.M.'s testimony was confusing and inconsistent. He then began to discuss G.M.'s testimony regarding defendant placing his penis in G.M.'s hands. The following exchange then occurred:

"THE COURT: State, is there any evidence that the defendant touched GM's sex organ?

MR. MINSER [ASSISTANT STATE'S ATTORNEY]: Yes, your Honor. The defendant gave the victim oral sex. He indicated that the defendant's mouth --

THE COURT: He's talking about Count One.

MR. MINSER: Your Honor, in regards to Count One, the State charges the same act two different ways, Judge.

So when the defendant touched GM's sex organ with his mouth and he gave him oral sex, that is the act that the State is citing to and the act of sexual conduct.

THE COURT: Oh, so you're not -- you have not charged the -- you have not charged the defendant placing his penis in the victim's hand?

MR. MINSER: No, Judge.

THE COURT: Well, with that understanding then, the motion for directed finding is denied."

¶ 17     Defendant chose not to testify but called the responding police officer to impeach G.M.'s testimony regarding the length of time of the incident. Following closing arguments, the jury deliberated and found defendant guilty of both counts.

¶ 18     Defendant filed a motion for a new trial, which the trial court denied. Defendant was sentenced to 120 days in jail and 30 months of sex offender probation. Defendant timely appealed.

¶ 19                                    II. ANALYSIS

¶ 20     We start with defendant's first contention, that the trial court deprived him of a fair trial by not excusing certain jurors for cause. He argues that although Jurors 15, 94, and 78 all stated that they could be impartial, their "life experiences," as evidenced through their answers to *voir dire*

examination, demonstrated that they could not, and each should have been excused for cause. Citing *People v. Cole*, 54 Ill. 2d 401 (1973), and *People v. Stremmel*, 258 Ill. App. 3d 93 (1994), defendant claims that he was unduly prejudiced by having Juror 94, who is employed as a police officer, and Juror 78, who knew Hundley, on his jury. In response, the State contends that the court did not abuse its discretion in not excusing the three potential jurors for cause or by not allowing additional peremptory challenges to defendant and that he waived his arguments to Juror 15 and 78. We agree with the State.

¶ 21    "Simply stated, a fair trial requires impartial jurors." *People v. Vargas*, 277 Ill. App. 3d 289, 298 (1995). To secure a defendant's constitutional right to an impartial jury, inquiry during *voir dire* is permitted to ascertain whether a potential juror has any bias, opinion, or prejudice that would affect or control his ability to make a fair determination of the issues to be tried. *People v. Encalado*, 2018 IL 122059, ¶ 24. Impartiality is not a technical concept but rather a state of mind. *People v. Tondini*, 2019 IL App (3d) 170370, ¶ 17. Specifically, a person is not competent to sit as a juror if his state of mind is such that a party will not receive a fair and impartial trial with him as a member of the jury. *Id.* A prospective juror's remarks during *voir dire* must be considered as a whole, and, as each *voir dire* is unique, the propriety of dismissing a juror for cause must be considered on a case-by-case basis. *People v. Harris*, 225 Ill. 2d 1, 34 (2007).

¶ 22    The burden of showing that a potential juror is partial rests on the party challenging the juror, which requires more than a mere suspicion of bias. *Tondini*, 2019 IL App (3d) 170370 ¶ 18. "A court's failure to remove a juror for cause is grounds for reversal only if the defense exercised all of its peremptory challenges and an objectionable juror was allowed to sit on the jury." *Id.* An objectionable juror is forced upon a defendant when he has exhausted all of his peremptory challenges and there was "some attempt to persuade the trial judge that a juror the defendant was

required to accept could not be fair and impartial." *People v. Reid*, 272 Ill. App. 3d 301, 309 (1995). The determination to allow a challenge for cause lies within the sound discretion of the trial court, and it will not be disturbed absent an abuse of discretion. *Tondini*, 2019 IL App (3d) ¶ 18. "An abuse of discretion occurs when the conduct of the trial court thwarts the purpose of *voir dire* examination—namely, the selection of a jury free from bias or prejudice." *People v. Rinehart*, 2012 IL 111719, ¶ 16.

¶ 23    At the outset, we note that defendant's argument regarding Juror 15 is waived by not including a claim of error in his posttrial motion. See *People v. Enoch*, 122 Ill. 2d 176, 18 (1988) ("*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphasis in original)). Similarly, defendant's argument regarding Juror 78 is waived by not objecting, but rather acquiescing to, Juror 78's placement. Defendant admits as much as to Juror 78 and claims that his argument with respect to Juror 15 is merely to demonstrate his "wasted" final peremptory challenge, leading to Juror 94 being "forced upon" him. Irrespective of the impassioned language defense counsel uses to make his plea, we will not review his arguments with respect to either Juror 15 or Juror 78, finding them waived.

¶ 24    With respect to Juror 94, defendant cites *Cole* for the proposition that a juror is "presumed to be biased and therefore disqualified if he was related to a party to the litigation *** through certain indirect personal relationships." 54 Ill. 2d at 413. Here, he asserts, the "indirect personal relationship" which disqualifies Juror 94 is his profession as a police officer, which colored the way he viewed the facts of this case. However, we note that Juror 94's employment did not render him unfit to serve on the jury. See *People v. Jones*, 162 Ill. App. 3d 487, 493 (1987) ("[t]he mere

fact that a person has been a police officer or even the fact that the person is presently serving in that capacity is not enough to require allowance of a challenge for cause").

¶ 25    Defendant attempts to analogize *Stremmel* to the facts present here. In *Stremmel*, after a jury trial with significant amounts of both police and lay person testimony and physical evidence, the defendant was convicted of first degree murder. 258 Ill. App. 3d 93, 95-101. On appeal, the defendant argued, *inter alia*, that the trial court erred in declining to excuse a prospective juror for cause based on his relationships with officers serving as witnesses for the State. *Id.* at 111.  The juror in question was 19-year veteran of the same police department of all 11 testifying officers, was previously partners with a testifying officer, and stated under oath that he "would have no problem" judging the testimony of the officers. *Id.* at 110. The appellate court held that the mere fact that a potential juror was an police officer was insufficient to automatically allow a challenge for cause; however, if a police officer has a close relationship to the case, he should be excluded from serving. *Id.* at 113. The court reasoned that because several important pieces of evidence involved the credibility of the testifying witnesses, weighing the lay witnesses' testimony against the officer's testimony, the outcome of the case could have hinged on the credibility of the officers, including the juror's former partner. *Id.* at 113-14. Thus, the court reversed the conviction and remanded the cause for a new trial. *Id.* at 114.

¶ 26    We disagree with defendant's assertion that *Stremmel* and the case at bar are "close enough" to be analogous because both the juror in *Stremmel* and Juror 94 are police officers empaneled in a criminal case, hearing testimony from witnesses who are "a part of the same society or corporation." Unlike the juror in *Stremmel*, Juror 94 does not work in the same department—or the same county for that matter—as Liberio and did not have a relationship with any of the witnesses who testified.  Furthermore, our review of Juror 94's answers to the *voir dire* questions

reveals, contrary to defendant's assertions, that Juror 94 has not been extensively involved in investigating criminal sexual abuse cases, that he could render a not-guilty verdict without having to justify it to his colleagues, and that he would view the evidence presented as an "average person who was looking [at the facts] from the outside." This belies defendant's arguments that Juror 94's employment as a police officer and his answers to *voir dire* questions demonstrates that he was biased against defendant.

¶ 27    Moreover, in denying the motion for cause, the trial court found Juror 94 truthful and that his demeanor and answers were appropriate even after the "vigorous questioning" from defense counsel. In light of the record before us and the trial court's opportunity to evaluate Juror 94's responses and assess his candor (*People v. Harris*, 231 Ill. App. 3d 876, 879 (1992)), we conclude that the court's determination to not excuse Juror 94 for cause was not an abuse of discretion.

¶ 28    We next address defendant's second contention that the trial court violated defendant's due process rights when it granted the State's motion to amend the language of count II of the indictment. Defendant argues that the amendment was substantive and that, as a result, the jury heard irrelevant and prejudicial testimony about an uncharged act. He further argues that the change of the indictment violated the one-act, one-crime principles espoused by *People v. King*, 66 Ill. 2d 551 (1977) and its progeny. Because his substantial rights were violated by the amendment, defendant urges us, in his reply brief, to conduct a second-prong plain error analysis. The State contends that, by failing to object to its motion to amend the indictment, defendant has waived any arguments on appeal and further asserts that no error occurred. Again, we agree with the State.

¶ 29    The first step in plain-error analysis is to determine whether any error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). If an error occurred, reviewing courts may consider an

unpreserved error when the error is clear or obvious and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. McDonald*, 2016 IL 118882, ¶ 48. Second-prong plain-error analysis applies where the error is so serious that review is necessary to preserve the integrity of the judicial process and provide a fair trial. *People v. Glasper*, 234 Ill. 2d 173, 213 (2009). The defendant has the burden of persuasion to establish plain error, and if he fails to meet that burden, the procedural default will be honored. *People v. Hillier*, 237 Ill. 2d 539, 545-47 (2010).

¶ 30    Here, no error occurred. Once a grand jury has returned an indictment, it may not be materially changed or broadened in scope except by the grand jury itself. *People v. Jones*, 2012 IL App (2d) 110346, ¶¶ 52-54. However, section 111-5 of the Code of Criminal Procedure of 1963 (Code) provides that an indictment may be amended on either party's motion at any time to address formal defects, including the presence of any unnecessary allegation. 725 ILCS 5/111-5(d) (West 2018). Amendments to an indictment that change the manner in which the defendant committed the offense are formal, not substantive. *People v. Ross*, 395 Ill. App. 3d 660, 670 (2009). Amending formal defects in an indictment "is warranted especially where there is no resulting surprise or prejudice to the defendant or where the record clearly shows that he was otherwise aware of the charge against him." *Id.* at 667.

¶ 31    In moving to strike "for purposes of sexual gratification or arousal of the defendant or G.M." in count II (penetration) of the indictment, the State was requesting to remove an unnecessary allegation pursuant to subsection 111-5(d) of the Code. See *People v. Kolton*, 219 Ill. 2d 353, 370 (2006) (holding an indictment alleging sexual penetration need not specifically allege

it was done for the defendant's sexual gratification); see also *People v. Burton*, 399 Ill. App. 3d 809, 814 (2010) (holding an indictment alleging sexual conduct must allege it was done for the purposes of the defendant's sexual arousal or gratification). Following established precedent, the trial court appropriately granted the State's motion.

¶ 32    Nevertheless, defendant maintains that this change necessarily altered the charges from two separate acts (the defendant placing his penis in G.M.'s hands and the oral copulation) to one (the oral copulation), which diminished the integrity of the judicial process and denied defendant a fair trial. Contrary to defendant's assertions, the integrity of the judicial process remains intact. The unobjected-to amendment of the indictment was formal and removed an unnecessary allegation. To the extent that the amendment to count II changed the nature of count I, it was permissible because it would have only changed the manner in which defendant committed the offense (from touching G.M.'s penis with his hand to touching it with his mouth). See, *e.g.*, *Ross*, 395 Ill. App. 3d at 671 (holding that the amendment to an indictment, which changed the type of sexual contact from penis-to-anus contact to penis-to-vagina contact in a criminal sexual assault case, was formal). The State did not seek to alter an essential element of the indictment, broaden its scope, or change the offense with which defendant was charged. We therefore find no clear or obvious error.

¶ 33    Furthermore, we reject defendant's argument that because of the amendment, the jury heard "totally irrelevant" testimony about the uncharged act of defendant placing his penis in G.M.'s hands, which caused undue prejudice against defendant. This testimony was not irrelevant, but rather a part of the continuing narrative of the incident. See *People v. Pikes*, 2013 IL 115171, ¶ 20 ("evidence of other crimes may be admitted if it is part of the 'continuing narrative' of the charged crime"). Additionally, defendant's argument that this amendment violated *King*, 66 Ill. 2d

at 566 (prohibiting multiple convictions for multiple offenses that are based on the same physical act), is also meritless. Although defendant was charged with and found guilty of multiple counts of aggravated criminal sexual abuse for performing oral sex on G.M., the record proves that only one conviction and one sentence were entered on count II. Therefore, the trial court did not err when it granted the State's motion to amend count II of the indictment.

¶ 34    Defendant's next contention is that the trial court erred in denying his motion to suppress statements that he made during the interview, because he made those statements involuntarily while in custody.[1] We note that the record before us lacks the full transcript of the hearing on defendant's motion to suppress. When the issue on appeal relates to the conduct of a hearing, this issue is not subject to review absent a record of the proceeding. *Webster v. Hartman*, 195 Ill. 2d 426, 432 (2001). Absent a record, "it [is] presumed that the order entered by the trial court [is] in conformity with law and had a sufficient factual basis." *Foutch v. O'Brien*, 99 Ill. 2d 389, 392 (1984). Without the complete record of the hearing, we cannot fully address defendant's argument on appeal. We do, however, have before us the record of the court's reasoning for denying the motion, as well as the video of the interview. Having reviewed both, we conclude that the court did not err in denying defendant's motion to suppress statements he made during the interview.

¶ 35    In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). A trial court's findings of fact are not disturbed unless they are against the manifest weight of the evidence, but the ultimate legal

_____

[1] In his reply brief, defendant conceded that he reengaged with the investigators after he asked if he should have a lawyer present during the interview and withdrew his argument that the investigators ignored his invocation for counsel.

determination as to whether a motion to suppress should have been granted is a question of law we review *de novo*. *People v. Rivera*, 227 Ill. 2d 1, 11 (2007).

¶ 36    The test for voluntariness of a statement is whether a defendant made his confession freely and voluntarily, without compulsion or inducement of any kind, or whether his will was overborne at the time of the confession. *People v. Morgan*, 197 Ill. 2d 404, 437 (2001). To determine the voluntariness of a statement, courts look to the totality of the circumstances, including: the defendant's age, intelligence, background, experience, education, mental capacity, and physical condition at the time of questioning; the legality and duration of the detention; the presence of *Miranda* warnings; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises. *People v. Richardson*, 234 Ill. 2d 233, 253-54 (2009). Where a defendant challenges the admissibility of an inculpatory statement through a motion to suppress, the State bears the burden of proving, by a preponderance of the evidence, that the statement was voluntary. *Id.* at 254. If the State succeeds in presenting its *prima facie* case, the burden shifts to defendant to produce some evidence that the confessions were involuntary. *People v. Patterson*, 154 Ill. 2d 414, 445 (1992).

¶ 37    The record before us reveals that defendant was 42 years old at the time of the interview, which lasted a little under two hours. The video establishes that defendant was read his *Miranda* rights and indicated that he understood them. Throughout the interview, defendant was alert, cooperative, and engaged with the investigators, who remained respectful to defendant and spoke to him in a conversational tone. He seemed to be intelligent and followed the questions of the investigators with no issue. Defendant quickly inferred that the interview was regarding something sexual, even if the investigators did not directly ask him about the details of the incident. In fact, the trial court found that the investigators were "clever" in conducting the interview. After

determining that the State had met its burden, defendant did not put on any contradictory evidence to show his statements were involuntary or coerced in any way. In the absence of any evidence to the contrary, we cannot find that the trial court was unreasonable in finding that defendant's statements to the investigators were voluntary. When we consider the various factors, they collectively demonstrate that defendant's will was not overborne during the interview and therefore his statements were voluntary.

¶ 38    Finally, defendant makes a conclusory argument that the trial court erred in admitting the photos of the Snapchat messages into evidence because the State failed to lay a proper foundation. The State maintains that it elicited sufficient testimony lay a proper foundation. The admissibility of evidence is a matter within the sound discretion of the trial court, and it will not be overturned on appeal absent a clear abuse of discretion. *People v. Nixon*, 2016 IL App (2d) 130514, ¶ 36. An abuse of discretion occurs only where the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would take the view adopted by the trial court. *Id.*

¶ 39    Here, the State elicited testimony from both G.M. and Liberio concerning the photographs. G.M. testified that defendant added his contact information into G.M.'s Snapchat account, that he had changed defendant's identifying username to "Greg," and that the two had conversed using that app before. G.M. also testified as to the conversation that took place at Liberio's instruction and that the photographs fairly and accurately depicted the conversation that he had with defendant over Snapchat. Likewise, Liberio testified that he photographed every Snapchat conversation "to document the communication, exactly how it happened." He also identified the photographs truly and accurately depicted the conversations between G.M. and defendant as well as the conversations he had with defendant while posing as G.M. Additionally, in the interview,

defendant identified his Snapchat username, acknowledged the Snapchat conversations between him and G.M., and admitted that he sent the photograph of his penis to defendant.

¶ 40    With the foregoing facts firmly established, we cannot say that the trial court abused its discretion in finding that the State laid sufficient foundation to admit the photographs into evidence.

¶ 41                                III. CONCLUSION

¶ 42    For the reasons stated, we affirm defendant's aggravated criminal sexual abuse conviction.

¶ 43    Affirmed.