2022 IL App (3d) 190283

Opinion filed May 18, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
|---|---|---|
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-19-0283 Circuit No. 16-CF-373 |
| | ) ) | |
| MITCHELL DEANDRE BUSH, | ) ) | The Honorable John P. Vespa, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE DAUGHERITY delivered the judgment of the court, with opinion.
Presiding Justice O'Brien and Justice Hauptman concurred in the judgment and opinion.

**OPINION**

¶ 1    After a bifurcated jury trial, defendant, Mitchell Deandre Bush, was found guilty of

multiple felony offenses, including first degree felony murder (felony murder) (720 ILCS 5/9-

1(a)(3) (West 2016)), aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), and unlawful

possession of a weapon by a felon (*id.* § 24-1.1(a)).[1] Defendant was sentenced to consecutive

prison terms of 65 years for felony murder and 15 years for aggravated battery with a firearm

---

[1]Pursuant to defendant's request, defendant's jury trial was bifurcated as to defendant's unlawful
possession of a weapon by a felon charge.

and to a concurrent prison term of 7 years for unlawful possession of a weapon by a felon. No sentences were imposed on the remaining findings of guilty. Defendant appeals, arguing that (1) he was not proven guilty beyond a reasonable doubt of felony murder; (2) under the facts of the instant case, mob action could not properly serve as the underlying felony for the felony murder conviction; (3) the jury verdicts were legally inconsistent; (4) he was deprived of a fair trial due to cumulative error; and (5) his sentences for felony murder and aggravated battery with a firearm were excessive. We agree with a portion of defendant's third argument (inconsistent verdicts). We, therefore, affirm defendant's convictions and sentences of felony murder and unlawful possession of a weapon by a felon, reverse defendant's conviction of aggravated battery with a firearm, vacate the jury's finding of guilty of reckless discharge of a firearm, and remand the case for a new trial on defendant's aggravated battery with a firearm charge.

¶ 2                                    I. BACKGROUND

¶ 3        On May 17, 2016, defendant and his cousin, Henry Mayfield (Mayfield), were involved with several other people in a neighborhood brawl on Virden Street in Peoria, Illinois. During the brawl, defendant shot and killed Dwayne Jones and shot and injured Lathaniel Gulley (Gulley). Portions of the brawl and of the shooting were captured on two different cell phone videos. The following month, defendant and Mayfield were charged in a superseding indictment with one count of first degree murder (strong probability murder), one count of felony murder, one count of aggravated battery with a firearm, and two counts of mob action, arising out of the neighborhood brawl. In addition to the joint charges, defendant was also charged individually with one count of first degree murder (strong probability murder) and one count of unlawful possession of a weapon by a felon.

2

¶ 4   In November 2018, during pretrial proceedings, defendant filed a motion *in limine* seeking to admit into evidence at trial as a prior inconsistent statement a rap video that was made by two of the State's witnesses, Gabriel (Gabe) Gulley and Gulley. During the video, Gabe described what had happened when the shooting occurred. Prior to doing so, Gabe stated on the video that what he was going to say was true. At a hearing on the motion held that same day, the State objected to defendant's request, arguing that the video was a work of art and was not necessarily a prior statement. After considering the arguments of the attorneys and watching the video, the trial court denied defendant's motion *in limine*.

¶ 5   In March 2019, a jury trial was held in defendant's case.[2] The trial took five days to complete. During the evidence phase of the trial, several witnesses were called to testify. In addition, numerous exhibits were admitted into evidence, including the two cell phones videos that were filmed during the shooting; screenshot photographs from the two videos; photographs of the home where the shooting took place showing bullet strikes to the front of, and inside, the home; certain items of physical evidence (spent shell casings, a bullet, and a mop handle) that were recovered from the scene of the shooting by the police; photographs showing where those items of physical evidence were recovered; and the recorded police interview of defendant.

¶ 6   Many of the facts surrounding the shooting were either not in dispute or were captured on the cell phone videos. As to those facts, the evidence presented as trial established the following. On May 17, 2016 (the day of the shooting), an argument arose between members of Minnie Roberson's family and members of Laterra Price's family over an expensive belt that Price's son, D.J., had sold to Roberson's son, M.F., but then Price wanted returned. The belt belonged to Price.

---

[2]Defendant's and Mayfield's cases were severed prior to trial.

¶ 7    Roberson lived with her children at the Virden Street home where the shooting took place, and Price lived a few minutes away in the same neighborhood. Roberson's home was a single story, rectangular-shaped home with a front yard that was enclosed by a waist-high, chain-link fence that separated the front yard from the sidewalk and the street. When viewed from the street, the front yard sloped up from the street and sidewalk to the front of the home, the front door was located in about the center of the home, a small set of concrete steps led up to the front door, and a concrete driveway was located on the right side of the front yard. At the driveway, the fence recessed further into the front yard to where an opening or gate was located.

¶ 8    The argument over the belt escalated over the course of the day with members of Price's family returning to Roberson's home several times, a physical confrontation ensuing, and the police being called. During the physical confrontation, Roberson's boyfriend, Gulley, and/or other members of Roberson's family struck Tresean Dillard and Jayurion Mayfield (Jayurion), who were the teenaged-cousins of Price. Dillard was the son of Sharonda Brown, and Jayurion was the son of Mayfield and Kimberly Williams (Williams). When the police arrived after the first physical confrontation, they found Price, Dillard, and Jayurion standing next to Price's car in the street in front of Roberson's home, arguing with Roberson, who was standing in her front yard. Brown, Dillard's mother, arrived shortly thereafter. After repeated requests by the police, Price and the two teenagers (Dillard and Jayurion) left the premises and went home. Brown also left the premises. The police talked to Price shortly thereafter, and she assured the police that she would not return to Roberson's home.

¶ 9    While the first physical confrontation was occurring, Jayurion's father, Mayfield, was at dialysis. Mayfield was on dialysis for kidney failure and had a catheter in his chest that was connected to his heart and his arm. Mayfield planned to spend the rest of the day after dialysis

4

with defendant, who was Mayfield's cousin. Jayurion's mother, Williams, picked up Mayfield from dialysis and then picked up defendant. Unbeknownst to Williams and Mayfield, defendant was carrying a handgun that day. According to defendant, he had found the gun in his family's garage and was hoping to talk to Mayfield about possibly selling the gun to make some money. While Williams was driving, she received a phone call from Price, who was Williams's niece. Williams put the call on speaker phone. Defendant was in Williams's car when that phone call took place. During the call, Price told Williams about the first physical confrontation and stated that Jayurion had been "jumped" by the people at Roberson's house.

¶ 10       Williams went to Price's home and picked up Jayurion. Once inside the vehicle, Jayurion told Williams and Mayfield what had happened. Defendant was still in the vehicle when that conversation took place. Williams drove with Mayfield, Jayurion, and defendant in her vehicle to Roberson's home and parked her vehicle on the side of the street. As Williams was arriving at the home, two or three other cars pulled up and parked in the street. Several people got out of those cars, including Price, Dillard, and Brown. In total, there were about 8 to 20 people on the street or sidewalk in front of Roberson's home.

¶ 11       Shortly before the cars arrived at Roberson's home, Roberson had left with Gulley to pick up Gulley's son from school. While they were out, Roberson received a phone call from her children about a commotion at the house and became concerned. Gulley also received a call from a neighbor, who told Gulley that people were gathering in front of the house. Roberson and Gulley dropped Gulley's son off at Gulley's mother's house and picked up Gulley's younger brother, Gabe, and Gulley's friend, Jones, for additional support or protection.

¶ 12       After Roberson and Gulley returned to the home and the cars pulled up in the street, the members of Roberson's family and those with them went outside to see what was going on. Two

groups formed—one behind the fence in Roberson's front yard (Roberson's group) and the other on the opposite side of the fence in the street or on the sidewalk (Price's group). Tensions quickly escalated as various members of the two groups shouted back and forth at each other. Mayfield grabbed a mop handle from Brown and went toward the gate to strike at Gulley and Jones. As Mayfield swung, Jones grabbed the mop handle, and he and Mayfield struggled over it. Defendant moved forward and fired several shots toward Roberson's group and home. One of the shots struck Jones in the abdomen; another struck Gulley in the arm. Roberson's group fled into the home, and Price's group fled the area. Jones died shortly thereafter.

¶ 13    The main issues at defendant's jury trial were whether Roberson's or Price's group was the aggressor in the brawl, whether defendant had fired the shots to protect himself and/or Mayfield, and whether it was legally proper for defendant to do so. On those issues, the underlying facts were in dispute. The State presented witness testimony to try to suggest that Price's group was the aggressor and that defendant fired the gun without reason or justification. The testimony of those witnesses in that regard can be summarized as follows.[3]

¶ 14    Roberson testified that during the earlier incident at her house that day, a confrontation arose between Dillard, Jayurion, and Price on one side and Roberson, Gulley, Roberson's daughter, and Roberson's daughter's boyfriend on the other side. According to Roberson, during that earlier incident, Jayurion and the other boy (Dillard) started to threaten Roberson and her family on Roberson's property. Roberson did not recall who took the first swing and did not see if any physical contact was made between anybody at that point because she was trying to separate people. The most contact was made between Roberson's daughter fighting with

_____

[3]Gulley's brother, Gabe, also testified for the State but generally claimed not to remember anything, other than that Gulley and Jones had been shot.

Mayfield's son, Jayurion. When the police came to Roberson's home shortly thereafter, Dillard, Jayurion, and Price were standing outside of Price's car in the street in front of Roberson's home in an uproar. The police officer kept instructing the three of them to get back into the car and leave the premises. Instead of doing so, Price, Dillard, and Jayurion kept jumping in and out of the car, threatening and saying things outside of the vehicle, and ignoring the officer's commands.

¶ 15 As the argument continued to escalate during the afternoon, Dillard's mother, Brown, pulled up to Roberson's house twice and tried to lure Roberson's family to the street corner, saying to Roberson's family, "You're not going to call the police, right?" Roberson and her family did not go down to the street corner to meet with Brown. Roberson did not know Brown and thought that Brown was trying to lure her to the corner to be killed. An altercation had already started, and Roberson felt threatened. After Brown pulled up the second time, two other cars pulled up with at least 20 other people. Roberson was standing on the front porch of her home recording on her cell phone in an obvious manner what Brown and the other people were saying and doing. Roberson later gave her phone to the Peoria Police Department so that they could extract the video.

¶ 16 According to Roberson, the people that were getting out of the cars and were in the street had sticks, brooms, or other items in their hands and were screaming obscenities. Gulley; Gulley's brother, Gabe; Jones; Jones's brother; and all of Roberson's children were in the driveway or front yard while Roberson was over by the front porch. Roberson did not see anyone, including her daughters, with knives, and no one in Roberson's yard had any weapons. The people from the street were coming up into the gate area of Roberson's home while Roberson was still recording. Roberson could see that one of the men in the street had a gun on

7

his hip. When Roberson saw the gun, she screamed to Gulley that the man had a gun. Roberson did not see anything get physical during the second confrontation; she was focusing on the man with the gun. At one point during the second confrontation, a woman got out of one of the cars and said that she wanted to talk to a parent. Roberson thought that the woman wanted to talk peace with her. Roberson did not have a chance to talk to the woman, however, because the shooter opened fire almost immediately.

¶ 17        On cross-examination, Roberson acknowledged that she did not call the police as the second incident (the shooting) was unfolding. Roberson also wavered during her testimony on whether she had any type of weapon during the incident, saying that to her knowledge, she did not; that if she did, it was not a deadly weapon; and that if it was, she was in her home and had the right to defend her home. Roberson could not recall if she had stuffed something inside a stocking and had been waving that around.

¶ 18        Gulley testified that on the day of the shooting, earlier in the afternoon, he got into an altercation with Dillard at Roberson's house. During that altercation, Dillard was threatening Roberson, and Price was arguing back and forth about the belt. After Price and Roberson had finished arguing, Jayurion and Dillard started directing their comments at Gulley. Gulley asked Dillard (presumably) to repeat himself, and Dillard stated that they "play[ed] with guns." Dillard went to say some other stuff, and a physical confrontation ensued. Gulley did not remember if he hit Dillard first or if Dillard hit him; Gulley just knew that Dillard was on the ground. At about that same time, Roberson's children started fighting with Jayurion. The police came to Roberson's house and got the situation under control. Price, Jayurion, and Dillard left, and Gulley and Roberson left as well to pick up Gulley's son from school.

¶ 19     While Gulley and Roberson were out picking up his son, the neighbor called Gulley and told him that there were several people outside of the house running their mouths. Gulley did not want to return to the house alone, so he stopped and picked up Jones for protection. When Gulley, Roberson, and Jones returned to Roberson's home, there was a car out in front of the house. A woman (Brown), who was irate, was yelling for Gulley to bring his "b*** a***" to the corner. Gulley refused. The woman left and then came back a short time later. That was when everything "broke loose."

¶ 20     When the woman returned to Roberson's house, a couple of other cars came with her. A lot of other people, about 13, got out of those cars. Gulley; his brother, Gabe; and Jones were standing in Roberson's driveway. Gulley had stayed in front of the house after the woman had left to see what was going on. Neither Gulley nor Jones had any type of gun, knife, or stick. Upon arriving at Roberson's house, the people in the cars got out and were running their mouths and saying all types of stuff. Gulley was standing there to see if anyone was planning to run up the driveway. Roberson was up by the house.

¶ 21     Some of the people who had showed up to the house during that second confrontation were Mayfield, Jayurion's father; Jayurion; Dillard; and defendant. Gulley had never seen defendant before but was not really worried about him. Gulley saw that defendant had a gun but did not think that defendant would use it because there were too many people present. Mayfield swung a broomstick and tried to hit Gulley. Jones grabbed the stick and attempted to take it away from Mayfield. Mayfield yelled shoot, and defendant shot. Gulley took off running. Jones got hit by one of the bullets first, and then Gulley got shot in the arm. Gulley did not remember how many times defendant had fired. Everyone on Roberson's side, including Gulley, ran for the

9

house. When Gulley got into the house, Jones was on the floor. Gulley knew that Jones was hurt but did not know that Jones was dead.

¶ 22 At the time of the shooting, Gulley was about 24 years old. Dillard and Jayurion were teenagers, about 17 or 18. When asked why he was fighting with someone so much younger than him, Gulley said that Dillard looked like he was 18 and that Dillard should not have been making threats and talking about coming back to the house with guns and stuff. Although Gulley took Dillard seriously when he said that, Gulley did not call the police. Gulley also did not call the police after the neighbor called him and told him about the people at Roberson's house.

¶ 23 During cross-examination, Gulley admitted that leading up to shooting, he was ready to fight and wanted to fight. Gulley acknowledged that he hit Dillard when Dillard made a threat about shooting up Roberson's house. Gulley did not remember what was being said between the two groups just prior to the shooting—there were too many people present. Gulley also acknowledged that he had been convicted of a recent felony for cannabis and that he had a conviction in 2012 for failing to register as a sex offender.

¶ 24 Roberson's neighbor, Lee Ann Russell, testified that she lived on Virden Street directly across from Roberson. On the day of the shooting, when Russell came home from work shortly after 3 p.m., she noticed that Roberson and another woman were standing in front of Roberson's house, arguing back and forth. Russell went into her own home and called the police a short time later when things got more intense verbally outside. The first time around, the police were there for about 15 minutes trying to get everyone calmed down and to get people back in their cars and on their way. Roberson got into her car and left as well.

¶ 25 After Roberson and the police had left, the other woman kept returning to Roberson's house. The woman came back three or four times and was antagonizing Roberson's daughters.

10

The woman would stop in front of the house and would be yelling at the house. The woman would leave but would then return. The next time that the woman came back, she had another woman with her. The two women were mad and were yelling and were rattling Roberson's garbage cans and fence.

¶ 26    About 45 minutes later, Roberson returned. The woman came by again at that time or shortly thereafter. The woman saw that Roberson had some other people in her car so she left again, and Roberson and the people with her went into the house. About 10 minutes later, the woman returned with two carloads of people. The groups of people that came to Roberson's house were yelling and screaming at everyone inside the house. Roberson and the people in her house stayed inside and tried to ignore them. Some of the men who had shown up began leaning up against the fence. They were banging the fence and shaking it and yelling at everybody in the house. The men had something blue or green in their hands that looked like a pool noodle and were shaking it onto the fence.

¶ 27    Roberson and the people in her house came outside. Roberson was filming the entire incident. Roberson's group and the group in the street (Price's group) started to yell and scream at each other. The group in the street was shaking the fence and exchanging words with Roberson's group. It was starting to get intense again. All of a sudden, gunshots began going off. Russell ducked down to her kitchen floor. She did not see who was shooting.

¶ 28    Roberson's son, M.F., testified that he was about 12 years old on the date of the shooting. Earlier that day, when Price, Dillard, and Jayurion came to Roberson's house looking for the belt, an argument broke out between Roberson and Price. During that argument, Dillard said a threat or something, and Gulley "swung on him." Later that day, just prior to the shooting, Price and members of her family returned to Roberson's home. They came to Roberson's home in two

11

cars and were standing in the street. There were eight or nine people in Price's group. M.F. did not see any member of either group (Roberson's group or Price's group) with any weapons. The two groups were arguing back and forth, until one of the male members of Price's group tried to swing a broomstick at the crowd (presumably, at Roberson's group) and missed. Five or six seconds later, M.F. heard gunshots, and he and most of the other people in the front yard ran into the house. M.F. did not know who had swung the broomstick or who had fired the shots.

¶ 29      Roberson's other son, C.D., testified that he was about nine years old on the date of the shooting. When the shooting occurred, C.D. was standing on the outside stairs in front of the house. He did not have a gun or a knife, did not see anyone in the front yard with a gun or a knife, and did not see Roberson swinging any type of stick or anything. Just prior to the shooting, both sides were angry. There was a lot of yelling, and both sides were arguing and making threats back and forth. C.D. did not see anyone on his side of the fence with a weapon and did not remember whether anyone in Price's group had any weapons, like brooms or anything else. When the shots were fired, C.D. ran into the house. There were about seven shots in total. C.D. did not see the person who had fired the shots.

¶ 30      Peoria police Sergeant Keith McDaniel testified that he and Detective Clint Rezac interviewed defendant at the police station the day after the shooting. The interview was recorded on audio and video. The recording was admitted into evidence without objection and played for the jury. During the interview, defendant's story changed a few times. It went from defendant not being the shooter to defendant picking up the gun after someone had dropped it at the scene to the gun being defendant's gun from home. As the interview progressed, McDaniel and Rezac showed defendant still photos (screenshots) that had been taken from the cell phone videos that the police had obtained. The photos were admitted into evidence without objection

12

and some of the photos were shown to the jury. According to McDaniel, defendant eventually admitted during the police interview that he had the gun with him in Williams's car but maintained throughout the interview that he was scared when the shooting took place.

¶ 31    In opposition to the State's theory of the case, the defense presented witness testimony at defendant's jury trial to try to suggest that Roberson's group was the aggressor and that defendant had fired the gun to protect himself and Mayfield. The testimony of the defense witnesses in that regard can be summarized as follows.

¶ 32    Jayurion testified that he was about 16 years old when the shooting occurred and that Dillard was about 18 or 19 years old. Price was Jayurion's cousin and was a lot older than Jayurion. On the day of the shooting, right before the first physical altercation took place, Jayurion, Dillard, and Price were walking up to Roberson's house (presumably, to talk to them about the belt) when six or seven people came out of the house and began yelling and screaming at them. Price was eight- or nine-months pregnant at the time so Jayurion and Dillard were holding Price back. The people at the house began punching and kicking Jayurion and Dillard. Jayurion and Dillard did not fight back because there were too many people on the other side. Gulley was fighting Dillard, and the rest of the people from the house were fighting Jayurion. Jayurion did not think that he had done anything to provoke the people in the house. The physical fight took place in the street because the people from the house were pushing Jayurion and Dillard out of the yard. Eventually, the beating stopped. The police showed up, but did not really say or do anything about what had happened.

¶ 33    Later that day, Jayurion returned to Roberson's home with his mother, Williams, and his father, Mayfield. Defendant was also with them at that time. Williams, Mayfield, and defendant had picked Jayurion up at Price's house. When Jayurion got into Williams's car, he told

13

Williams that they had just gotten "jumped." Price's house was only a minute or two away from Roberson's house. Jayurion and the others went to Roberson's house in Williams's car.

¶ 34     When they got to Roberson's home, Jayurion saw that the people from the house had gotten about 10 other people to be there with them. Some of the people from the house were in the driveway; others were in the street. Williams got out of the car and said that she was there to talk to the mom. The group from the house (Roberson's group) got loud. They had knives, bats, broomsticks, cans in socks, and other items, although Jayurion did not remember who specifically had those weapons. There was some arguing back and forth, and Roberson's group was telling Jayurion's group (Price's group) to fight. Some of the people from Roberson's group were already out in the road. Jayurion feared for his safety at that point because some of the members of Roberson's group had weapons. He also feared for his mother's and father's safety as well. Jayurion did not see his father (Mayfield) fighting with anyone. Although Roberson's group was trying to attack Jayurion's father, Jayurion's father just sat there quietly the whole time and did not say anything back to Roberson's group. Jayurion did not remember anyone screaming out, "shoot him!" Jayurion was paying attention to himself and did not see what defendant was doing. Everything happened very quickly. As the arguing was going on, Jayurion heard shots being fired and ran back to Price's house.

¶ 35     Williams testified that she and Henry Mayfield were Jayurion's parents. Williams first saw Mayfield that day when she picked him up from dialysis, which Mayfield was on due to kidney failure. Mayfield had a catheter in his chest that was connected to his heart and his arm. After Williams picked up Mayfield from dialysis, she also stopped and picked up defendant. Usually after dialysis, Mayfield and defendant would go to Williams's house and play a game. Mayfield would be kind of ill and would not be able to do much, except go somewhere and sit.

14

As they were driving, Williams's niece, Price, called Williams and told her that Jayurion had been "jumped on" by multiple adults and other people. Williams was trying to get to the bottom of the situation so she went and picked up Jayurion at Price's house. On the way, Williams told Mayfield what had happened. Williams did not know if defendant was paying attention at that time; it was a matter between Williams and Mayfield.

¶ 36        When Jayurion got into Williams's car, Williams asked Jayurion what had happened. Jayurion told Williams that multiple adults and children "jumped on" him, Dillard (who had a broken leg), and Price (who was pregnant). Williams asked Jayurion where the house was located where the incident had occurred. She then went to Roberson's home, which was a few blocks over from Price's house, and asked if she could speak to the parent. Williams was not going to there to fight; she was hoping to squash the situation before it turned into what it turned into. Williams just wanted to resolve the situation and find out why all of those adults "jump[ed] on" her 16-year-old child. Williams told Mayfield where she was going but did not tell defendant. Mayfield did not get angry at that point and agreed with Williams's efforts to resolve the situation.

¶ 37        Williams and the other people in her car went to Roberson's home and parked on the street next to the curb, not in the middle of the street. Williams did not call anyone on the phone and did not tell anyone that she was going to Roberson's home. At some point, other cars pulled up with people in them that Williams knew. Williams had no idea the other people were coming to Roberson's home. According to Williams, she went to Roberson's home with peaceful intentions. She did not know anyone at that house or know who was going to be at the house. Williams was hoping to talk to a parent.

15

¶ 38      When Williams arrived and asked to speak to a parent, the mom (Roberson) came out on the porch with her cell phone in her hand recording and said that she was the mom. That was when other cars pulled up. Williams assumed that Roberson was filming because Roberson stated that she had this on camera. Roberson said that loudly enough for everyone to hear. Roberson also stated to Williams and the others that if they wanted the belt, to come take it. Williams was trying to be respectful of Roberson's home and to have an adult-type chat with Roberson about their children fighting earlier. Williams knew some of the people in the cars that had pulled up, like her daughter, Jerricca Williams (Jerricca); Dillard; and Dillard's mother, Brown. Williams assumed that Brown and Dillard came to Roberson's home because the people from the house had "jumped on" Dillard as well.

¶ 39      Shortly after Williams got out of the car, the people on the house side of the fence (Roberson's group) became very hostile. Williams stood there in disbelief, surprised by the reaction of Roberson's group. Some of the people in Roberson's group had weapons—knives, sticks, and something in socks. They were all in a guarded position, ready to fight. The people with the weapons were standing along the driveway, like a front line. Williams did not remember what was said. There was no indication that the people in Roberson's group wanted to speak peacefully with anyone. Williams did not have any broomsticks or metal poles in her car when she arrived at Roberson's home. Also, to her knowledge, she did not have a gun in her car. Williams did not bring defendant with her to Roberson's home for protection. When Williams talked to the detectives after the shooting, she only knew that defendant had fired the gun from what the detectives had told her. Williams did not bring anyone to the scene to shoot anybody. That was not her intention.

¶ 40    As the incident was unfolding, there was a lot of arguing back and forth between the two groups. Then, gunshots went off. Williams ran away. She did not go back to her car and did not stick around to see what had happened. According to Williams, shortly before the shooting occurred, one of the guys in Roberson's group, she thought it was the guy who had been killed, kept running up toward Mayfield in an aggressive manner. Williams did not remember if that person was saying anything. As far as Williams knew, Mayfield went to Roberson's home with peaceful intentions. Mayfield took some aggressive actions because someone was trying to approach him and hurt him. Williams did not see who fired the gun. Everything happened so fast.

¶ 41    Brown testified that she was the mother of Dillard. During the afternoon of the shooting, Price called Brown and told her that Dillard had "got[ten] jumped" very badly. Dillard's leg was already broken at the time, and he was on crutches. When Price called Brown, Price was yelling and screaming on the phone, so Brown went to that location. Although Brown lived just around the corner from Roberson's home, she did not know Roberson and had never been to Roberson's house.

¶ 42    When Brown got to the residence (shortly after the first physical confrontation), the police were already there. Brown spoke to the police officer but could not remember his name. The officer told Brown not to worry about the people in the home because they were getting kicked off the block anyway, that the people at the home always started trouble, and that the people in the home would be off the block really soon.

¶ 43    As Brown was on her way home, she got a call from Dillard telling her that the people at the house were sending him threatening messages and were telling him to come back to the residence. Brown was in her car at the time. Brown went back to Roberson's home to see if the

17

mother was there, but she was not. Brown did not call the police at that time because the police did not do anything the first time around.

¶ 44        Brown had been told that it was adults that had "jumped" the kids. Brown thought that the mom would have wanted to talk because the whole thing was a big misunderstanding. Dillard was not feeling safe, so Brown just wanted to go talk to the mom herself. Brown was hoping for a peaceful resolution. The mom was not there when Brown went to the home the first time, so Brown left and came back later. Other people were there, just not the mom. Brown did not make any threats to the people at the house; she just asked if the mom was there. The people at the house told Brown that the mom was not home but that she would be back later. According to Brown, the kids at the house threatened her at that time and told her that the mom was going to get people when the mom got back. Brown did not get out of the car; she just told the kids at the house to let her know when their mom returned home. The threat made Brown afraid at first, but she did not call the police. She was ready to talk to the mom and was expecting a different response from the mom. Brown did not think the mom was a threat at that time.

¶ 45        Brown went back to, or by, Roberson's home a couple of times, but the mom was not home yet. Brown did not threaten the people at Roberson's home and did not ask them to come down to the street corner and fight. Brown was never able to speak to the mom one-on-one. The last time Brown went to Roberson's home was the incident when the shooting occurred. Brown was still hoping to talk to the mom at that time (before the shooting occurred), but there was screaming, yelling, and commotion. When Brown stopped at Roberson's home the last time, Roberson was there, as was Gulley, and some other people whose names Brown did not know.

¶ 46        Brown knew Williams because Williams was her cousin. Brown did not remember whether Williams was there at that time but did remember that Williams was there at some point

18

that day. Brown also did not remember if anyone was with her in her car the last time she went to Roberson's home, other than Dillard. Brown did not know defendant and did not remember if defendant was there that day since everything happened so fast. Brown went back the last time because she still wanted to talk to the mom. Brown did not call anyone and did not tell anyone to meet her at Roberson's home. Brown did not remember how many cars were parked in the street but did remember that there were other cars parked there besides hers. Dillard was in the car with Brown and had shown her the messages that the girl at Roberson's home had sent him.

¶ 47 When Brown got to Roberson's home the last time, there was a lot of screaming, yelling, and back and forth. The people (presumably, Roberson's group) had knives and stuff that they were throwing. They also had socks with canned goods inside of them. One person had his shirt off and was beating his chest. It was just a lot of commotion. People were making verbal threats to Brown. Brown did not hear the people on her side of the fence (Price's group) making threats. She heard her cousin, Williams, saying that she just wanted to talk to the mom. Brown did not get in her car and go away because she wanted to settle it. She felt that the police did not do anything at first, and she did not want the problem. Brown was scared for her safety when Roberson's group started coming toward them. That was when Brown grabbed a stick (mop handle) from the garbage. It was all a blur for Brown after that point. Brown thought it was Roberson's group that had fired the shots.

¶ 48 Brown knew that Mayfield was her cousin's father and saw Mayfield at Roberson's residence. Brown did not remember giving Mayfield the stick. Everything happened so fast. Everyone was screaming and yelling, and people were arguing. As the people from Roberson's group were coming toward Price's group, Brown heard shots being fired, and everyone took off. Brown did not remember whether she got in her car or just ran away.

19

¶ 49     During her testimony, Brown denied that she had tried to get the people from Roberson's house to come down to the street corner and fight and said why would she do that when there were so many people on the other side. When Brown went to Roberson's home the first time, some of the grown men there were threatening Brown, telling her to come back and that they had something for her. Brown told one of the kids at Roberson's home to call her when their mom got back because she wanted to talk to the mom.

¶ 50     On cross-examination, Brown indicated that she did not call the police because she thought the mom was civilized to talk. Brown stated that when she told the mom to come to the corner and talk, the mom said, "f*** you." Brown and the others stayed there arguing. During her testimony, Brown was shown a photograph in court and acknowledged that she was the person in the photograph holding the stick. Brown admitted that she had parked her vehicle in the middle of the street and said that she had done so because she had seen a lot of people there. When Brown heard that Dillard had been in a fight, she was more scared than angry.

¶ 51     Brown denied that she brought any sticks, poles, or weapons of any kind to the residence. Brown also denied that she knew that either of the other two cars were going to Roberson's home. Brown was surprised to see all of those people coming to that location and to see all of the people in the house, especially the grown men. Brown denied that she tried to initiate a fight or physical confrontation with anyone at any time.

¶ 52     Jerricca testified that she was the daughter of Williams and Henry Mayfield. Shortly before the shooting occurred, Jerricca went to Roberson's home because she had been told by her cousin, Price, that her little brother, Jayurion, had gotten "jumped on." Jerricca rode to Roberson's home in Brown's car. Brown was another one of Jerricca's cousins. Jerricca did not remember talking to her mom or dad about Jayurion getting "jumped"; she was at Price's house.

20

She also did not talk to defendant that day. Jerricca was upset when she heard that Jayurion had gotten "jumped" and wanted to see why the people at the house had "jumped" Jayurion. She was not going to the residence to get revenge for her brother. Jerricca knew Roberson's daughters and had said hello to them at times from around the neighborhood. One of Roberson's daughters had previously had a crush on Jayurion so Jerricca thought things would be peaceful when she went there. Jerricca's mom, Williams, was being the peacemaker. Jerricca thought that they could settle the issue peacefully.

¶ 53 When Jerricca got to the altercation (the second physical confrontation) at Roberson's home, Jayurion and a bunch of other people were already there, and the whole neighborhood was outside. There were several people in Roberson's front yard, and a lot of yelling and screaming were taking place. Jerricca started yelling and screaming as well because other people were yelling and screaming at her. One of Roberson's daughters was very aggressive toward Jerricca. Two of the people in Roberson's group had knives, including one of Roberson's daughters. Jerricca had a little plastic broomstick but did not remember where she had gotten it from. She had the stick, not because she was getting ready to attack the other people, but because the other people had knives. Jerricca threw the stick away after it bent when she hit the fence with it. Jerricca saw that her father, Mayfield, was there, arguing with Gulley. She did not see her father with a pole or swinging a pole, but her attention at that time was on the girl with the knife.

¶ 54 It was a very chaotic scene. There was a lady on the porch, a guy ripping his own shirt off, and people being aggressive. Jerricca interpreted what the people in Roberson's group were doing as an indication that they wanted to fight. She heard someone yell out, "We got guns too," and threats being made. After hearing some more yelling, Jerricca heard shots being fired. She could not tell who was doing the shooting. Jerricca ducked and ran, and everyone scattered.

21

¶ 55 On cross-examination, after being questioned about what she had told the police following the shooting, Jerricca remembered that she had gone to the Virden Street address earlier that day as well and that a young girl had opened the window and had yelled to her that her mother was not home. The young girl said her mother would be back later so Jerricca left. Jerricca acknowledged on the witness stand that she was being aggressive when she hit Roberson's fence with a pole.

¶ 56 Dillard's testimony indicated that he was about 18 years old at the time of the shooting. According to Dillard, he did not get into a fight with Gulley on that day—Gulley just punched him. They were breaking up two females who were fighting, Price and some other woman. Price was Dillard's cousin. The fight was about a belt. At that time, it was Dillard, Jayurion, and Price. Jayurion had said that he had gotten "jumped," but Dillard did not see that happen. The first physical confrontation was a big fight with a lot of people fighting each other. Dillard did not remember how that fight stopped.

¶ 57 Brown was Dillard's mother. Later in the day, Dillard went back to Roberson's home with his mom, but he stayed in the car and let her talk it out with the adults. Dillard was on crutches at the time and was not really paying attention when the shooting occurred. He was still in the car and was probably on his cell phone. Dillard could hear people arguing and a lot of yelling but could not really hear what was being said. According to Dillard, he did not remember much from that day and had tried to forget it. Dillard did not know defendant and had never seen defendant before.

¶ 58 The 36-year-old defendant testified that on the day of the shooting, Williams and Mayfield picked him up at his home after Mayfield's dialysis. Defendant was Mayfield's cousin. Defendant's plans for the evening were to smoke some weed, relax, and watch a basketball game

on television with Mayfield. Defendant usually spent Tuesday and Thursday evenings with Mayfield after Mayfield's dialysis session had finished for the day. Mayfield was a diabetic with kidney failure and had been on dialysis for about a month.

¶ 59        Defendant believed that Mayfield was in poor medical condition. Mayfield spoke to defendant all the time about his disease and had a catheter in his chest. About a week or two prior to the shooting, defendant saw Mayfield have a problem with the catheter. One of the caps came off, and the tube was leaking blood. The way defendant viewed Mayfield was that Mayfield was disabled and that he should not be involved in a physical altercation due to his condition. During defendant's testimony, a photograph of Mayfield's catheter was admitted into evidence without objection and was shown to the jury.

¶ 60        According to defendant, before he arrived at Roberson's home that day, there was no indication that he and Mayfield were going to be involved in a physical altercation. Defendant had not spoken to Mayfield before Mayfield and Williams had picked him up and was merely following his regular routine of getting together with Mayfield after Mayfield's dialysis session. Defendant had a gun on him when he got into Williams's car but did not tell Mayfield or Williams. Defendant had found the gun the previous day when he was rummaging through his family's garage looking for some props for a music video he was filming. Defendant planned to show the gun to Mayfield and was hoping that Mayfield might know someone who was willing to purchase the gun. The gun had no case, was a .45-caliber, and had some World War memorabilia on it, which defendant thought made it more valuable. Defendant did not show Mayfield the gun in the car because he did not want Williams to know he had a gun. Williams would not have allowed defendant in the car if she had known. Defendant did not hear any of the phone call that came into the car, was looking at his cell phone when Jayurion got in and not

23

paying attention, and was not aware of any problems that were happening with Jayurion that day. Neither Williams nor Mayfield seemed upset when defendant was in the car, and there was no indication that anything was wrong.

¶ 61      As defendant, Williams, and the others arrived at Roberson's home, defendant saw that there were some people standing outside, which, according to defendant, was not unusual. Defendant thought that Mayfield and Williams knew the people that were outside and assumed that the location was where he and Mayfield were going to relax for the evening. After defendant and the others got out of Williams's car, defendant heard Williams yell that she wanted to speak to the mother. That was when defendant's "alert system" went off, and defendant felt the tension right away. A lady on the porch with her phone out videotaping responded, "I'm the mom." Defendant knew he was being videotaped at that time. The gun was on defendant's waist, but he was not thinking about the gun at that moment.

¶ 62      A lot of yelling started. At first, it was just a bunch of commotion. Defendant could not make out what was being said because he was still 5 or 10 feet away. Defendant asked Mayfield what was going on. Mayfield told defendant to just go up the street, that it had nothing to do with defendant. Mayfield was defendant's older cousin, and defendant usually took Mayfield's advice, so he started walking up the street. Defendant did not know why Williams was trying to find out who the mom was and did not know that Jayurion had gotten into a fight earlier that day. Defendant did not hear anyone speaking about a fight while he was in Williams's car.

¶ 63      Defendant got just past the driveway when he started hearing threats. Some of the threats were being made directly to him by Gulley. Defendant did not know who Gulley was at that time. After hearing the threats, defendant pulled out his gun so that Gulley could see it and told Gulley that Gulley was not going to do anything to defendant. Defendant knew that Gulley saw

24

the gun. Gulley looked defendant straight in the eyes and stated, "f*** that gun, we got guns, too." Defendant believed Gulley and felt even more afraid. Defendant was overcome by fear and his alertness was heightened. Defendant cocked the gun back and told Gulley, "This ain't no toy. I'm not playing." Defendant believed that Gulley saw him do that. Gulley did not respond.

¶ 64　　According to defendant, the people in the driveway tried to charge. Defendant looked to his side to see where Mayfield was located. Mayfield was struggling with another person over a broomstick. Defendant thought the broomstick came from Roberson's group because he knew that the people in Williams's car did not bring any broomsticks with them to that location and he had not seen anyone on the street side of the fence pass a broomstick to Mayfield. Defendant was terrified seeing Mayfield struggling over the broomstick because he knew Mayfield's physical condition. Defendant believed that Roberson's group had guns and feared that they were ready to do damage to Price's group. Members of Roberson's group had said so and were clutching at their waistbands. One guy in Roberson's group took his shirt off; another guy already had his shirt off. Defendant took that to mean that the people in Roberson's group were ready to fight. Defendant thought that Roberson's group was going to come out onto the street at any moment. Defendant also believed that Gulley had something to match defendant's gun since Gulley did not care about defendant's gun. Defendant feared that he or Mayfield could get seriously hurt or killed if Roberson's group got a hold of either of them.

¶ 65　　Defendant felt that he was in a lot of danger. The only people defendant knew out there were Mayfield, Williams, and Jayurion. Defendant saw the other two cars pull up but did not know anyone in those other two cars. He thought they might be a threat to him as well. Defendant felt that the other people behind him were also a threat, even though he did not hear the people behind him making any threats to him. Essentially, defendant felt that everyone out

25

there was a threat. Defendant claimed that on the video, he could clearly be seen turning around looking at everyone and trying to watch his back, side, and front. Defendant was as scared for Mayfield as he was for himself. Defendant fired the gun when he saw that Mayfield was in a physical altercation and was struggling with someone else over the broomstick.

¶ 66 Defendant did not know if the first shot he fired had struck anyone. He fired a second shot because the people in Roberson's group were still in a fighting stance and were acting like they were going to charge again. Defendant did not remember how many shots he fired in total. According to defendant, when he fired all of the shots, he was not aiming at a particular person and was not trying to hit anyone. He was just trying to get Roberson's group to back off because he was scared and because he felt that firing the gun was the only option he had left. The entire incident happened in 30 seconds or less. Defendant fired the first shot while aiming at the ground and fired the remaining shots while aiming over everyone else's heads.

¶ 67 After defendant fired the gun, he noticed that Mayfield had hit the ground so defendant picked Mayfield up and ran to Williams's car. Defendant opened the passenger door and placed Mayfield inside. Defendant got in the driver's side, took off, and drove to his own house. There was no conversation between defendant and Mayfield at that time. They were both shocked. Defendant got out and told Mayfield he would call him later. Mayfield left in the car. The next day, Mayfield and defendant were arrested.

¶ 68 On the witness stand, defendant admitted that he was not being entirely truthful with the police at the beginning of his interview. Rather, according to defendant, he had tried to lie to the police because he did not think that he had the right to defend himself and Mayfield that way. Defendant believed that he was in imminent danger and that the only thing that was going to get him out of that situation was firing the weapon, but he did not think that he had a right to do so

26

because he was not licensed to carry a firearm. Defendant felt that firing the weapon was the last and only option he had left. Defendant showed Roberson's group that he had a gun; that was his warning. Roberson's group disregarded that warning and still charged. Defendant had never fired a gun before, did not have experience with guns, and did not believe that there was a strong probability of death to another person from firing the gun in the manner that he did so.

¶ 69    On cross-examination, defendant stated that he could not just get back into Williams's car, even though the car was unlocked, because he was already away from the car and everything happened so fast. Defendant admitted that he was the only person at the scene who pulled out, or fired, a gun. Defendant did not see anyone else with a gun, but the people in Roberson's group were clutching at their waistbands. Defendant acknowledged that Mayfield could be seen on one of the cell phone videos swinging the pole but denied that he saw Mayfield swing the pole when the incident was unfolding that day. Defendant also acknowledged that he was the person holding the gun in the video/screenshot and that he was pointing the gun even possibly before Mayfield was struggling with the pole. Defendant denied that when he pulled the gun, the people on the other side started to run up the driveway. According to defendant, he was just aiming at the ground and was not trying to hit anyone. Defendant admitted later during his testimony, however, that he did not point the gun at the ground and that he did not point the gun in the air or down the other side of the street. Defendant denied, though, that he pointed the gun at the level where the people were in front of him and stated that he might have pointed the gun in the direction of the other people but aimed it toward the ground.

¶ 70    Following the shooting, defendant drove to Joliet and threw the gun in a river because he did not want to get caught with the gun since he was unlicensed. According to defendant, he lied to the detective during the interview because he was worried he was going to get in trouble for

27

having an unlicensed firearm, not because he shot anybody. At the time, defendant did not know that he had a right to defend himself or his family when he was carrying an unlicensed firearm. Defendant did not load the gun; the gun was already loaded, and defendant knew that it was loaded. Defendant had some confidence, therefore, that when he pulled the gun out and pulled the trigger that a bullet would come out.

¶ 71      In addition to the evidence presented, during defendant's trial, a juror issue arose that is relevant to one of the issues raised in this appeal. On the third day of trial, when there was still one alternate juror available, one of the jurors realized and told the trial court that she was related by marriage to Gulley and his brother, Gabe. More specifically, the juror informed the trial court that her daughter was married to Gulley and Gabe's mother. Upon being questioned about the matter, the juror indicated that she had no preconceived opinions about Gulley, that she had never met Gulley, that she did not recognize Gulley's name when the witness list was read to the jury, and that her knowledge of Gulley and Gabe's mother did not affect her ability to be fair and impartial.[4] After the questioning was finished and the juror had gone back to the jury room, the trial court commented, "Does anybody want to be—my initial reaction is the same as my reaction now, she stays on the jury. I don't think it's even a close call." The trial court asked the attorneys if they wanted to be heard on the matter, and both sides declined. The trial court then ruled that the juror would stay on the jury. Back in the courtroom but still outside the presence of the jury, the trial court judge stated for the record that he and the attorneys "all agree[d] that [the] juror should remain on the jury."

---

[4]The questions that the court and the attorneys asked the juror about this matter were generally targeted at the juror's knowledge of, and relationship with, the mother and Gulley and generally did not mention Gulley's brother, Gabe.

28

¶ 72    After all of the evidence had been presented, the attorneys made their closing arguments. The State argued that defendant was guilty of murder, aggravated battery with a firearm, and mob action and that defendant was not acting in self-defense when he fired the handgun. The defense argued that Roberson's group was the real mob that day; that Jones, Gulley, and some of the other members of Roberson's group were the ones who should have been charged with mob action; and that defendant fired the weapon to protect himself and Mayfield. In making those arguments, defense counsel acknowledged that there were other charges available to the jury if the jury believed that defendant had misinterpreted the situation or had overreacted, but defense counsel asserted to the jury that defendant had not done so. Defense counsel told the jury further that the jury would have to decide which group (Roberson's or Price's) was committing mob action that day and referred to Price's group (the group to which defendant arguably belonged) at one point during some of those comments as "Mob B." Defense counsel also told the jury that it would have to "pay close consideration" to the mob action charges because self-defense was not a defense to mob action.

¶ 73    Following the closing arguments, the trial court instructed the jury on the law. Pursuant to defendant's request, the jury was instructed on the lesser offenses of second degree murder (as a lesser mitigated offense of first degree murder), involuntary manslaughter (as a lesser included offense of first degree murder), and reckless discharge of a firearm (as a lesser included offense of aggravated battery with a firearm), and also on the affirmative defense of self-defense.[5]

_____

[5]The State initially opposed defendant's request to instruct the jury on involuntary manslaughter as a lesser included offense of first degree murder, but, after conducting additional research, the State informed the trial court that it believed that defendant was entitled to that instruction. After additional discussion, the State agreed further that by the same reasoning, defendant was also entitled to an instruction on reckless discharge of a firearm as a lesser included offense of aggravated battery with a firearm. The State prepared those lesser included offense instructions as a courtesy to defense counsel.

Without objection from defendant, the wording of some of the jury instructions was changed at times to distinguish between defendant's felony murder charge and his other first degree murder charge.[6] The felony murder charge was referred to in the instructions and the verdict forms at times as "First Degree Murder (Type B)," and defendant's other first degree murder charge was referred to at times as "First Degree Murder (Type A)." See *People v. Lefler*, 2016 IL App (3d) 140293, ¶¶ 9-12 (describing similar labels that had been used in the jury instructions in that case to distinguish between the defendant's felony murder charge and his other first degree murder charges).

¶ 74        As for a concluding instruction, without objection from defendant, the jury was given Illinois Pattern Jury Instructions, Criminal, No. 26.01J (4th ed. 2000) (hereinafter IPI Criminal 4th).[7] With regard to the offenses of aggravated battery with a firearm and reckless discharge of a firearm, the typewritten concluding instruction provided as follows:

> "The defendant is also charged with the offense of Aggravated Battery. You will receive two forms of verdict as to this charge. You will be provided with both a 'not guilty of Aggravated Battery', and a 'guilty of Aggravated Battery' form of verdict.
>
> From these two verdict forms, you should select the one verdict form that reflects your verdict pertaining to the charge of [Aggravated Battery] and sign it

---

[6]The initial count of first degree murder (strong probability murder) that was filed against defendant and Mayfield jointly was dismissed prior to trial on motion of the State.

[7]It appears from the record that the concluding instruction was incorrectly labeled and incorrectly referred to in the trial court as IPI Criminal 4th No. 26.01I, rather than IPI Criminal 4th No. 26.01J. IPI Criminal 4th No. 26.01I is used when a defendant is charged with first degree murder, second degree murder, involuntary manslaughter, and no other charges, which was not the situation in the present case.

30

as I have stated. You should not write at all on the other verdict form pertaining to the charge of Aggravated Battery.

* * *

The defendant is also charged with the offense of Reckless Discharge of a Firearm. You will receive two forms of verdict as to this charge. You will be provided with both a 'not guilty of Reckless Discharge of a Firearm', and a 'guilty of Reckless Discharge of a Firearm' form of verdict.

From these two verdict forms, you should select the one verdict form that reflects your verdict pertaining to the charge of [Reckless Discharge of a Firearm] and sign it as I have stated. You should not write at all on the other verdict form pertaining to the charge of Reckless Discharge of a Firearm."

¶ 75    During its deliberations, the jury informed the trial court at various times that it had questions for the court to answer. One of the questions that the jury submitted to the trial court was whether the jury could find defendant guilty of both felony murder (first degree murder (type B)) and second degree murder. After discussing the matter with the attorneys, the trial court responded to the jury that it could find defendant guilty of both offenses.

¶ 76    Upon completing its deliberations, the jury found defendant guilty of felony murder, second degree murder, aggravated battery with a firearm, reckless discharge of a firearm, two counts of mob action, and unlawful possession of a weapon by a felon.[8] The trial court ordered that a presentence investigation report (PSI) be prepared on defendant for sentencing, and the case was scheduled for a hearing on posttrial motions. The following month, defendant filed a

_____

[8]As noted previously, defendant's jury trial was bifurcated as to the unlawful possession of a weapon by a felon charge.

31

motion for judgment notwithstanding the verdict or for new trial (and a supplement to that motion), which the trial court later denied. Defendant did not raise the issue of inconsistent verdicts in either his original or supplemental posttrial motion.

¶ 77    In May 2019, the trial court held a sentencing hearing in defendant's case. At the time of the sentencing hearing, the trial court had before it defendant's PSI, two victim impact statements, and some letters written from jail personnel on defendant's behalf. The PSI indicated that defendant was 36 years old and had graduated from high school in 2001. Defendant had worked sporadically for several years and, prior to being incarcerated, was self-employed as a video editor for music videos, commercials, promotional videos, and entertainment business. In his work, defendant made about $1000 per month. Defendant was unmarried and had five children, ranging in ages from 7 to 20. Defendant had been convicted of numerous criminal offenses over the course of his adult life. Defendant had one prior felony conviction for manufacture or delivery of cocaine in 2002. He was initially sentenced to a period of probation for that offense, but his probation was later terminated unsuccessfully. Defendant had also previously been convicted of several traffic and misdemeanor offenses, including battery in 2001 (from a 2000 case) and 2009, possession of cannabis in 2006 and 2009, and two separate domestic batteries in 2010. In his prior adult offenses (including the prior felony offense), defendant had received probation or conditional discharge six times and had his probation or conditional discharge terminated unsuccessfully or revoked nearly every time.

¶ 78    As for the victim impact statements, the first victim impact statement was written and read by Kenisha Davis, Jones's mother. In that statement, Davis described how devastating it was for her to lose her son and for Jones's daughter (Davis's granddaughter) to lose her father. According to Davis, Jones's daughter was only four years old when Jones was killed and lost the

32

only parent that she had ever known. The second victim impact statement was written and read by Nia King, Jones's sister. In that victim impact statement, King described how she, her siblings, Jones's daughter, and Jones's fiancée had struggled trying to cope with Jones's death. As with Davis, King also commented in her victim impact statement upon the significance of the loss of Jones to Jones's daughter.

¶ 79    With regard to the letters in support of defendant, those have not been made part of the record on appeal. However, the comments that were made about those letters in the sentencing hearing indicate that the letters were submitted by a jail chaplain or chaplains and that the letters indicated that defendant had become a changed person in jail and had helped to counsel other inmates.

¶ 80    As for sentencing recommendations, the State recommended that the trial court sentence defendant to something more than the minimum sentence, which was 51 years in prison on the felony murder and the aggravated battery with a firearm convictions (20 years for felony murder with a 25 year firearm enhancement and 6 six years for aggravated battery with a firearm, with the sentences to run consecutively). In making that recommendation, the State commented upon defendant's prior criminal history, defendant's belief that he was a victim in the whole situation, and defendant's dangerous character. Defense counsel, on the other hand, asked the trial court to impose only the minimum prison sentence (51 years) upon defendant. As part of his recommendation, defense counsel asked the trial court to consider in mitigation the fact that the jury found that defendant's self-defense or defense-of-others claim was sincere but unreasonable, as evidenced by the jury's finding of guilty of second degree murder. Defense counsel also commented that defendant had no prior history of gun violence.

¶ 81    In response to defendant's request for the minimum sentence, the trial court stated:

33

"Well, if I give him 51 which is the very minimum and he's got a prior felony conviction and five failed probations, okay, what do I give a guy who would stand before me convicted of these same charges who has no prior felony convictions and no prior failed probation? What would I give him then if I'm giving your guy the minimum?"

¶ 82    Upon the trial court's request, defense counsel specifically addressed defendant's rehabilitation potential and stated that the letters that had been written on defendant's behalf showed that defendant was a changed person and that defendant could become a productive member of society.

¶ 83    After the attorneys had finished making their sentencing recommendations, defendant made a statement in allocution. Defendant told the trial court that he was sorry that Jones had died and that Gully had gotten shot, but that in defendant's heart and mind, he believed that he was forced to react to the situation. Defendant stated that he took the actions that he did when the shooting occurred, not because he wanted to kill anyone, but because he felt threatened and felt that he did not have a choice—he was simply trying to protect his family and himself from great bodily harm. Defendant stated further that he lied to the police after the shooting occurred because he did not know better and because he was scared at the time. Defendant denied that he was guilty of mob action and stated that the situation leading up to the shooting was just two parents (presumably Williams and Mayfield) trying to keep the peace and to find out what had happened to their son.

¶ 84    Following defendant's statement in allocution, the trial court announced its sentencing decision. The trial court sentenced defendant to consecutive prison terms of 65 years (40 years plus a 25-year firearm enhancement) for felony murder and 15 years for aggravated battery with

34

a firearm and to a concurrent prison term of 7 years for unlawful possession of a weapon by a felon. The trial court did not impose sentences on defendant for the remaining findings of guilty. In making its sentencing decision, the trial court found that there were no factors in mitigation that applied to defendant but that there were two factors in aggravation that applied—that defendant had a history of criminal activity and that a sentence was necessary to deter others from committing the same crimes.[9] The trial court commented that defendant had minimized the nature of the offenses and that defendant's version of events was contrary to what was shown in the cell phone videos of the incident. The trial court also noted the impact that Jones's death had on Jones's family and commented that defendant's prospects for rehabilitation were low as indicated by the fact that defendant had lied to the police, had thrown the gun off of a bridge, and had minimized the nature of the offenses in his statement in allocution.

¶ 85        Defendant filed a motion to reconsider sentence and again asked the trial court to consider in mitigation the fact that the jury had found that defendant had acted with an unreasonable belief in the need for self-defense or defense-of-others. After considering the arguments of the attorneys, the trial court denied defendant's motion. Defendant appealed.

¶ 86                                          II. ANALYSIS

¶ 87                         A. Proof Beyond a Reasonable Doubt of Felony Murder

¶ 88        As his first point of contention on appeal, defendant argues that he was not proven guilty beyond a reasonable doubt of felony murder. More specifically, defendant asserts that the evidence was insufficient to prove the underlying mob action charge because the evidence failed

---

[9]The trial court indicated that, in sentencing defendant, it was only going to consider defendant's prior misdemeanor convictions and not defendant's prior felony conviction because the prior felony conviction had already been used by the State to charge defendant with unlawful possession of a weapon by a felon.

35

to show that he and Mayfield were acting together or with a common plan or purpose at the time of the offense. On the contrary, defendant maintains, the evidence established that defendant did not know about the altercation that had occurred earlier in the day, whose home to which he had arrived, or the reason that he and the others were going to that home. In addition, defendant contends, the State presented no evidence that defendant participated in the altercation with Mayfield prior to the shooting (before defendant believed that Mayfield's life was at risk) or that defendant and Mayfield had an agreement that defendant would shoot at Jones during the altercation. Based upon the alleged insufficiency of the evidence, defendant asks that we reverse outright his conviction for felony murder.

¶ 89        The State argues that defendant's felony murder conviction was proper and should be upheld. The State asserts that the evidence in this case was sufficient to show that defendant and Mayfield were acting together at the time of the offense as necessary to prove the underlying charge of mob action. According to the State, the witness testimony and video evidence presented at trial showed that defendant knew of the prior altercation and of the reason for going to Roberson's home and that defendant acted with Mayfield to attack Jones and Gulley. The State asks, therefore, that we affirm defendant's conviction of felony murder.

¶ 90        Pursuant to the *Collins* standard (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)), a reviewing court faced with a challenge to the sufficiency of the evidence must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found the elements of the crime proven beyond a reasonable doubt. *People v. Jackson*, 232 Ill. 2d 246, 280 (2009). In applying the *Collins* standard, the reviewing court will allow all reasonable inferences from the record in favor of the prosecution. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). The reviewing court will not retry the defendant. *People v. Austin M.*, 2012 IL

36

111194, ¶ 107. Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Thus, the *Collins* standard of review fully recognizes that it is the trier of fact's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. See *Jackson*, 232 Ill. 2d at 281. That same standard of review is applied by the reviewing court regardless of whether the evidence is direct or circumstantial or whether defendant received a bench or a jury trial, and circumstantial evidence meeting that standard is sufficient to sustain a criminal conviction. *Id.*; *People v. Kotlarz*, 193 Ill. 2d 272, 298 (2000). In applying the *Collins* standard, a reviewing court will not reverse a defendant's conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it leaves a reasonable doubt of the defendant's guilt. *Austin M.*, 2012 IL 111194, ¶ 107.

¶ 91        As noted above, defendant's felony murder conviction in the instant case was based upon the underlying felony of mob action. To sustain the charge of mob action as it was filed in the present case, the State had to prove, among other things, that defendant acted together with one or more persons without authority of law (the joint-action element). See 720 ILCS 5/25-1(a)(1) (West 2016).The joint-action element is satisfied when the evidence presented shows joint or concerted action or cooperative effort—that the defendant and the other person or persons involved acted pursuant to an agreement or a common criminal purpose. See *People v. Barnes*, 2017 IL App (1st) 142886, ¶¶ 3, 26, 38-39, 68. To establish joint action, it is not enough for the State to merely show that the defendant and the other person were present at the same place and same time and were doing the same thing, since the law does not allow guilt by association. See

37

*id.* ¶¶ 38, 42. Rather, to prove the joint-action element, "an intent to join with others in a mutual pursuit—like the members of a gang—is typically required." *Id.* ¶ 38.

¶ 92　　　In the present case, after reviewing the record from defendant's jury trial, we find that the evidence was sufficient to prove that defendant was acting together with Mayfield (and the other members of Price's group) when the underlying mob action allegedly occurred. The strongest evidence of defendant and Mayfield's concerted action came from the testimony of Gulley, if the jury chose to believe him, wherein Gulley stated that, during the struggle over the broomstick, Mayfield yelled shoot and defendant fired. In addition to that evidence, the jury had before it two cell phone videos that showed some of the events that occurred just prior to, and during, the shooting. Through those videos, the jury could see and hear some of what actually took place as the shooting was unfolding. The jury was also presented with testimony that defendant was in the car when Price told Williams on speakerphone that Jayurion had been "jumped"; that defendant was also present in the vehicle when Jayurion told Williams and Mayfield what had happened during the prior altercation; and that defendant went to Roberson's home with Williams, Mayfield, and Jayurion at precisely the same time that several other people connected to Price also went to Roberson's home. The jury could have reasonably inferred from that evidence that defendant was aware of the prior altercation; that defendant was aware of Price's group's purpose for going to Roberson's residence; and that defendant, Mayfield, and the other members of Price's group had jointly gone to Roberson's home to fight Roberson's group or to take revenge for the altercation that had happened earlier that day. Defendant's assertions to the contrary are not supported by the video evidence that was presented, which showed defendant and Mayfield actively involved in the escalating confrontation immediately prior to the shooting. Viewing all of the evidence in the light most favorable to the State, as we are required to do on

appeal (see *Jackson*, 232 Ill. 2d at 280), we find that the evidence presented was sufficient to satisfy the joint-action element of the mob action charge. We also conclude, therefore, that defendant was proven guilty beyond a reasonable doubt of felony murder.

¶ 93                    B. Mob Action as the Underlying Felony for Felony Murder

¶ 94        As his second point of contention on appeal, defendant argues that the mob action charge could not properly serve as the underlying felony for the felony murder charge in this case because the act that formed the basis of the mob action charge—which defendant describes on appeal as defendant firing a series of shots into the crowd at Roberson's home—was the direct and only cause of Jones's death, was inherent in Jones's murder, and was not committed with an independent felonious purpose. Defendant asks, therefore, that we reverse outright his conviction for felony murder.

¶ 95        The State argues that defendant's felony murder conviction was appropriate and should be upheld. In support of that argument, the State asserts first that defendant forfeited this claim by failing to raise it in the trial court. Second, and in the alternative, the State asserts that even if this court reaches the merits of this issue, defendant's argument should still be rejected because the acts that gave rise to the mob action charge were not inherent in the felony murder charge and had a separate felonious purpose. Thus, the State contends that the mob action charge was a legally proper underlying felony for the felony murder charge in this case. For those reasons, the State asks that we affirm defendant's conviction of felony murder.

¶ 96        In response to the State's claim of forfeiture, defendant asserts, and we agree, that the forfeiture rule does not apply here because defendant's claim is considered to be a challenge to the sufficiency of the evidence and, as such, constitutes an exception to the forfeiture rule. See

39

*In re Dionte J.*, 2013 IL App (1st) 110700, ¶ 79. We, therefore, turn to the merits of defendant's argument on this issue.

¶ 97    The question of whether a certain forcible felony, such as the mob action charge in the instant case, can properly serve as the underlying felony for a defendant's felony murder conviction is a question of law that is subject to a *de novo* standard of review on appeal. *People v. Davison*, 236 Ill. 2d 232, 239 (2010).The purpose behind the felony murder statute is to deter the commission of forcible felonies and to limit the violence that accompanies such offenses by subjecting anyone who commits a forcible felony to a first degree murder charge if another person is killed during the commission of that offense. *Id.*; *People v. Dennis*, 181 Ill. 2d 87, 105 (1998). However, because the offense of felony murder is unique in that it does not require the State to prove an intentional or knowing killing, unlike other forms of first degree murder, our supreme court has repeatedly expressed concern that a felony murder charge could, in effect, improperly allow the State to both eliminate the offense of second degree murder and to avoid the burden of having to prove an intentional or knowing killing as generally required for a first degree murder conviction, given that many murders are accompanied by the same underlying forcible felonies. See, *e.g.*, *Davison*, 236 Ill. 2d at 239-40. Our supreme court has held, therefore, that when the acts constituting a forcible felony arise from and are inherent in the act of murder itself, those acts cannot also serve as the underlying felony for a felony murder charge. See *id.* at 240; *People v. Morgan*, 197 Ill. 2d 404, 447 (2001); *Dionte J.*, 2013 IL App (1st) 110700, ¶ 71. Rather, in order to properly support a charge of felony murder, the underlying felony must have an independent felonious purpose—a purpose or motivation that is independent and apart from the killing itself. *Davison*, 236 Ill. 2d at 243-44; *Dionte J.*, 2013 IL App (1st) 110700, ¶ 79; *People v. Colbert*, 2013 IL App (1st) 112935, ¶ 13. In determining whether an independent

40

felonious purpose exists, the factual context surrounding the killing is of crucial importance. See *Colbert*, 2013 IL App (1st) 112935, ¶ 14.

¶ 98        In the instant case, after considering the legal principles set forth above and the factual context of the killing, we find that the acts that gave rise to the mob action charge were independent from, and involved a different felonious purpose than, the acts that resulted in Jones's death. The mob action offense was completed in this case when defendant, Mayfield, and the other members of Price's group went to Roberson's residence to fight Roberson's group and then started carrying out that common purpose using force or violence, such as when Mayfield swung at Jones and Gulley with the broomstick. That conduct was not inherent in the shooting that occurred immediately thereafter and involved a different felonious purpose. See *id.* ¶¶ 15-16 (finding that the acts that formed the basis of the defendant's mob action charge—the defendant taking part in a street brawl in an effort to physically intimidate and harass fellow students from a rival neighborhood—were independent from, and involved a different felonious purpose than, the acts that resulted in the murder victim's death—the defendant and several of his codefendants striking the murder victim multiple times during the same street brawl); *People v. Tamayo*, 2012 IL App (3d) 100361, ¶ 27 (finding that the acts that formed the basis of the defendant's mob action charge—the defendant beating up the murder victim's friend during a group fight—were independent from, and involved a different felonious purpose than, the acts that resulted in the murder victim's death—the defendant's cohort beating up the murder victim during the same group fight). We, therefore, conclude that under the facts of the present case, the mob action charge could properly serve as the underlying felony for defendant's felony murder conviction. *Davison*, 236 Ill. 2d at 243-44; *Dionte J.*, 2013 IL App (1st) 110700, ¶ 79; *Colbert*, 2013 IL App

(1st) 112935, ¶¶ 15-16; *Tamayo*, 2012 IL App (3d) 100361, ¶ 27. Accordingly, we affirm defendant's felony murder conviction.

¶ 99                              C. Legally Inconsistent Verdicts

¶ 100       As his third point of contention on appeal, defendant argues that his convictions (and, presumably, the jury's findings of guilty) must be reversed and the case remanded for a new trial because of inconsistent verdicts. More specifically, defendant asserts that (1) the jury's finding of guilty of reckless discharge of a firearm was legally inconsistent with its findings of guilty of felony murder and aggravated battery with a firearm because all three of the offenses were based upon the same continuous conduct of defendant firing the gun but involved mutually inconsistent mental states (reckless versus knowing conduct) and (2) the jury's finding of guilty of second degree murder was legally inconsistent with its finding of guilty of felony murder because the single murder in this case could not have been both mitigated (second degree murder) and unmitigated (felony murder). Defendant asserts further that upon receiving the inconsistent verdicts, the trial court should have given the jury additional instructions and ordered the jury to continue deliberating to resolve the inconsistency (if the jury had not already been discharged when the mistake was discovered) or ordered a new trial (if the jury had already been discharged). Instead, according to defendant, the trial court usurped the jury's function by choosing which findings of guilty to enter judgment and impose sentence upon. For those reasons, defendant asks that we reverse all of his convictions (and, presumably, all of the jury's findings of guilty) and that we remand this case for a new trial.

¶ 101       The State argues that the jury's verdicts were proper and should be upheld. In support of that argument, the State asserts first that defendant forfeited this claim by failing to properly preserve it in the trial court and by acquiescing in the jury's verdicts. Second, and in the

42

alternative, the State asserts that even if this court chooses to reach the merits of this issue, defendant's argument should still be rejected because the jury's verdicts were not legally inconsistent. More specifically in that regard, the State contends that (1) the jury's finding of guilty of reckless discharge of a firearm was not legally inconsistent with its finding of guilty of felony murder and aggravated battery with a firearm, despite the different mental states involved, because the jury's findings of guilty pertained to multiple shots and multiple victims and (2) the jury's finding of guilty of second degree murder was not legally inconsistent with its finding of guilty of felony murder because felony murder does not require the mental state necessary for murder and because the mitigating factors for second degree murder have no effect on the felony murder charge. In addition, according to the State, the jury instructions in this case were specifically tailored to prevent the jury from reaching legally inconsistent verdicts. For all of the reasons set forth, therefore, the State asks that we affirm defendant's convictions.

¶ 102    In response to the State's claim of forfeiture, defendant asserts, and we agree, that even if this issue has been forfeited, second prong plain error review would apply (assuming that an error had occurred) because this issue involves a claim of legally inconsistent verdicts. See *People v. Ousley*, 297 Ill. App. 3d 758, 764 (1998) (recognizing that a potentially forfeited claim of legally inconsistent verdicts should be reviewed under the plain error doctrine). In addition, despite the State's request, we decline to apply the concept of acquiescence here because our supreme court has placed the duty to take the necessary steps to prevent or cure legally inconsistent verdicts upon the trial court, rather than upon the potentially aggrieved party. See *People v. Carter*, 193 Ill. App. 3d 529, 533-34 (1990) (rejecting a similar argument by the State).

¶ 103    Turning to the merits of defendant's argument on this issue, we are mindful of the following legal principles that apply in analyzing claims of inconsistent verdicts. The

43

determination of whether verdicts are legally inconsistent is a question of law that is subject to a *de novo* standard of review on appeal. *People v. Price*, 221 Ill. 2d 182, 189 (2006). Verdicts are legally inconsistent when an essential element of each crime must, by the very nature of the verdicts, have been found to exist and to not exist, even though the offenses arise out the same set of facts. *Id.* at 188; *Lefler*, 2016 IL App (3d) 140293, ¶ 20. Of potential relevance to this appeal, courts have found verdicts to be legally inconsistent in situations where (1) the offenses at issue involved mutually inconsistent mental states and the jury found that both mental states existed (see, *e.g.*, *Price*, 221 Ill. 2d at 188-89); or (2) the jury determined that a single murder was both mitigated for the purpose of a second degree murder charge and unmitigated for the purpose of a first degree murder charge (see, *e.g.*, *People v. Porter*, 168 Ill. 2d 201, 214 (1995)).

¶ 104       When a jury returns legally inconsistent guilty verdicts, the trial court may not attempt to correct the problem by merely entering judgment on one or more of the verdicts and vacating the other verdicts. *Id.* To do so would be to usurp the jury's function to determine innocence or guilt. *Id.* Instead, the trial court must give the jury additional instructions and send the jury back for further deliberations to resolve the inconsistency. *Id.* If the trial court fails to do so, the inconsistent verdicts must be reversed and the case remanded for a new trial on those charges. *People v. Mitchell*, 238 Ill. App. 3d 1055, 1060 (1992) (interpreting the Illinois Supreme Court's case-law statement that the remedy for inconsistent verdicts is a retrial on all counts as meaning a retrial on all inconsistent counts); see *People v. Fornear*, 176 Ill. 2d 523, 535 (1997) (leaving the one conviction in place that the defendant did not contest and reversing and remanding the other convictions for a new trial where some of the jury's verdicts were legally inconsistent).

¶ 105       In the present case, after reviewing the record and considering the jury's verdicts, we find that the jury's verdict of guilty of reckless discharge of a firearm (referred to herein more simply

44

at times as reckless discharge) was legally inconsistent with the jury's verdict of guilty of aggravated battery with a firearm (referred to herein more simply at times as aggravated battery).[10] There is no dispute in this appeal that the reckless discharge offense and the aggravated battery offense involved mutually inconsistent mental states. Both charges pertained to defendant's act of shooting Gulley. For reckless discharge, the jury had to find that defendant had acted recklessly when he shot Gulley, and, for aggravated battery, the jury had to find that defendant had acted knowingly when he shot Gulley. In addition, it is clear from the jury instruction conference that defendant's request, and the intention of the parties, was that the jury would be instructed on reckless discharge of a firearm as a lesser included offense of the aggravated battery with a firearm charge. However, the jury instructions in this case were incorrect, and the jury was not instructed that it had to view the two offenses (aggravated battery and reckless discharge) as a greater and lesser offense. As the committee note to IPI Criminal 4th No. 26.01J indicates, the language for greater and lesser offenses must be used, instead of the language contained in the instruction, when the jury is to be instructed on a lesser included offense, such as the reckless discharge offense in the present case. See IPI Criminal 4th No. 26.01J, Committee Note. The jury was never informed in this case by either the jury instructions or the parties' closing arguments that reckless discharge was a lesser included offense of aggravated battery and that it could only find defendant guilty of one of those charges but not both. See *People v. Washington*, 2019 IL App (1st) 161742, ¶ 29 (describing a similar error that had taken place in that case). Although the State presents a scenario on appeal where, because of

---

[10]Although defendant has grouped the felony murder charge with the aggravated battery with a firearm charge in his argument on this issue, the felony murder charge did not pertain to defendant's shooting of Gulley, as the aggravated battery with a firearm charge and reckless discharge of a firearm charge did, and was not advanced by defendant as a lesser included offense of the felony murder charge. We, therefore, will only address whether the verdicts of guilty of aggravated battery with a firearm and reckless discharge of a firearm were legally inconsistent.

45

the multiple victims involved and the multiple shots fired at the victims and at Roberson's home, the jury might have been able to find defendant guilty of both offenses without returning legally inconsistent verdicts (see *People v. Spears*, 112 Ill. 2d 396, 405 (1986) (recognizing that where a claim of inconsistent guilty verdicts involves multiple shots or multiple victims, the question for the reviewing court is whether the trier of fact could rationally find separable acts accompanied by mental states to support all of the verdicts as legally consistent)), that was not the manner in which the parties had intended for the jury to consider the reckless discharge offense. We, therefore, conclude that the jury's finding of guilty of reckless discharge of a firearm was legally inconsistent with the jury's finding of guilty of aggravated battery with a fireman. See *Price*, 221 Ill. 2d at 188-89. Accordingly, we reverse defendant's conviction of aggravated battery with a firearm, vacate the jury's finding of guilty of reckless discharge of a firearm, and remand this case for a new trial on defendant's aggravated battery with a firearm charge. See *Mitchell*, 238 Ill. App. 3d at 1060; *Fornear*, 176 Ill. 2d at 535. At the new trial, defendant will be free to again ask for a lesser included offense instruction of reckless discharge of a firearm if the circumstances warrant, and the trial court will have to make a ruling on that request based upon the evidence presented. We have thoroughly reviewed the evidence in this case and find that the evidence presented at defendant's trial was sufficient to prove both charges (aggravated battery with a firearm and reckless discharge of a firearm) beyond a reasonable doubt and that a retrial on those charges (a possible retrial as to reckless discharge) will not raise double jeopardy concerns. See *People v. Drake*, 2019 IL 123734, ¶¶ 20-21 (indicating that double jeopardy does not bar a retrial when a conviction has been overturned because of an error in the trial proceedings, unless the evidence introduced at the initial trial was insufficient to sustain the conviction).

¶ 106     As for defendant's remaining claim on this issue—that the jury's verdicts finding him

guilty of second degree murder and felony murder were also legally inconsistent—this court

previously resolved that exact issue in the *Lefler* case cited above and found that guilty verdicts

of both second degree and felony murder were not legally inconsistent verdicts because the

factors that apply to mitigate first degree murder down to second degree murder were not

applicable to a felony murder charge. See *Lefler*, 2016 IL App (3d) 140293, ¶¶ 20, 26. We,

therefore, reject that portion of defendant's argument on this issue.

¶ 107                                    D. Cumulative Error

¶ 108     As his fourth point of contention on appeal, defendant argues that he was deprived of a

fair trial due to the cumulative effect of the following trial errors: (1) the trial court received

inconsistent verdicts that it failed to clarify and sentenced defendant on the more culpable

offenses (previous issue); (2) the trial court refused to allow defendant to present Gabe's rap

video as a prior inconsistent statement; (3) the trial court and defense counsel allowed a juror to

remain on the jury after learning that the juror was related to one of the victims, even though an

alternate juror was available; and (4) defense counsel provided ineffective assistance when,

contrary to defense counsel's theory of the case, defense counsel told the jury in closing

argument that self-defense was not a defense to mob action and implied to the jury that defendant

was a member of one of the mobs. According to defendant, the above-listed errors created a

pervasive pattern of unfair prejudice at defendant's trial such that it cannot be said that

defendant's trial was fundamentally fair. For that reason, defendant asks that we reverse his

convictions and remand this case for a new trial.

¶ 109     The State argues that defendant was not deprived of a fair trial and that defendant's

convictions should be upheld. In support of that argument, the State asserts that none of the

matters referred to by defendant constituted error in this case. More specifically, the State contends that (1) the jury's verdicts were not legally inconsistent; (2) the trial court did not abuse its discretion in denying defendant's request to admit Gabe's rap video; (3) the juror that defendant challenges did not suffer from a disqualifying bias and any error that otherwise occurred was invited by defendant; and (4) the actions of defense counsel of which defendant complains were generally matters of trial strategy and did not constitute ineffective assistance of counsel. For that reason, the State asks that we reject defendant's claim of cumulative error and affirm defendant's convictions.

¶ 110　　　　The determination of whether the cumulative effect of various trial errors warrants a reversal in a criminal case depends upon the reviewing court's evaluation of the individual errors. See *People v. Doyle*, 328 Ill. App. 3d 1, 15 (2002). A defendant in a criminal case, whether guilty or innocent, is entitled to a fair, orderly, and impartial trial conducted according to the law. See U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2; *People v. Bull*, 185 Ill. 2d 179, 214 (1998). It must be remembered, however, that no trial is perfect, and that a defendant in a criminal case is entitled to a fair trial, not a perfect one. *Bull*, 185 Ill. 2d at 214. That being said, it has been recognized that a situation may arise where a criminal defendant has been deprived of a fair trial, not by any individual error alone, but by the cumulative effect of the trial errors that occurred. See, *e.g.*, *People v. Blue*, 189 Ill. 2d 99, 138-40 (2000); *People v. Speight*, 153 Ill. 2d 365, 376 (1992); *People v. Jones*, 2019 IL App (3d) 160268, ¶ 50. When such cumulative trial error occurs, due process and fundamental fairness may require that the defendant's conviction be reversed and the case be remanded for a new trial, even when defendant's guilt is overwhelming. See *Jones*, 2019 IL App (3d) 160268, ¶ 50; *People v. Fultz*, 2012 IL App (2d) 101101, ¶ 54.

¶ 111    In the present case, after reviewing defendant's individual claims of error and the effect of any error that occurred on defendant's trial as a whole, we find that defendant was not deprived of a fair trial. As for defendant's first claim of error under this issue—inconsistent verdicts—we have already determined, as indicated above, that two of the guilty verdicts returned by the jury were legally inconsistent. We have reversed and vacated those verdicts and have remanded the greater of the two offenses for a new trial. We do not believe, however, that defendant's claim of inconsistent verdicts would otherwise contribute to his claim of cumulative error and defendant does not provide any additional explanation in that regard. We, therefore, will not address defendant's claim of inconsistent verdicts any further under this particular issue.

¶ 112    With regard to defendant's second claim of error under this issue—the denial of defendant's request to admit Gabe's rap video—we note that the trial court's ruling on the admissibility of evidence will generally not be reversed on appeal absent an abuse of discretion. See *People v. Pikes*, 2013 IL 115171, ¶ 12; *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). The threshold for finding an abuse of discretion is high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary, fanciful, or unreasonable or that no reasonable person would have taken the view adopted by the trial court. See *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *People v. Donoho*, 204 Ill. 2d 159, 182 (2003). Considering that standard of review and the evidence before the court on this matter, we cannot find that the trial court erred in denying defendant's request to admit the rap video. As the State correctly notes, the rap video was made solely for entertainment purposes and was not akin to a prior statement by the witness.

¶ 113    As for defendant's third claim of error under this issue—juror bias—we are not persuaded by defendant's argument. Contrary to defendant's assertion on appeal, the juror in this case did not suffer from an implied bias. See *People v. Cole*, 54 Ill. 2d 401, 413 (1973)

49

(recognizing that implied bias generally arises when a certain relationship exists between a juror and a party to the litigation which is so direct that it is presumed that the juror will be biased and, therefore, disqualified); *People v. Tondini*, 2019 IL App (3d) 170370, ¶¶ 17-19 (same). Indeed, there is no claim here that the juror was related to any of the parties. See *Tondini*, 2019 IL App (3d) 170370, ¶ 19 (stating that Illinois courts have defined a party as one who has a right to control the proceedings, to pursue a defense, to call and cross-examine witnesses, and to appeal from the decision). Nor is there any indication in this case that the juror was suffering from a disqualifying state of mind that would give rise to a claim of actual bias. See *Cole*, 54 Ill. 2d at 413 (recognizing that claims of actual bias are based upon a juror's state of mind—where a juror or potential juror's state of mind is such that a party will not receive a fair and impartial trial with that person on the jury); *Tondini*, 2019 IL App (3d) 170370, ¶¶ 17-18 (same). Although the juror in this case was related by marriage to Gulley (one of the victims/witnesses), she did not know Gulley and had never spoken to him. Defendant's mere speculation on appeal is not sufficient to establish a claim of juror bias, especially in light of the juror's unequivocal statement upon inquiry by the trial court that her relationship to Gulley and Gabe's mother would not affect her ability to be fair and impartial. See *Cole*, 54 Ill. 2d at 415. In addition, because the juror did not have a disqualifying bias, defense counsel in this case cannot be considered ineffective for failing to seek to have the juror removed from the jury. See *People v. Edwards*, 195 Ill. 2d 142, 165 (2001) (stating that defense counsel cannot be considered ineffective for failing to make or pursue meritless objections).

¶ 114 Finally, with regard to defendant's fourth claim under this issue—defendant's other assertions of ineffective assistance of trial counsel—we do not agree with defendant's assertions. Defense counsel spent the majority of his closing argument trying to convince the jury that the

real mob at the scene of the shooting that day was Roberson's group and not Price's group or defendant. That defense counsel may have referred to Price's group at one point as "Mob B," either because he wanted to emphasize to the jury that there were two groups at the scene of the shooting (not just Price's group) or because he misspoke, does not give rise to a claim of ineffective assistance of counsel. See *People v. Patterson*, 217 Ill. 2d 407, 441 (2005) (recognizing that matters of trial strategy will generally not support a claim of ineffective assistance of counsel); *People v. Perry*, 224 Ill. 2d 312, 355-56 (2007) (indicating that matters of trial strategy will generally not support a claim of ineffective assistance of counsel, even if defense counsel made a mistake in trial strategy or tactics or made an error in judgment); *People v. Cloyd*, 152 Ill. App. 3d 50, 57 (1987) (stating that in reviewing a claim of ineffective assistance of counsel, a court must consider defense counsel's performance as a whole and not merely focus upon isolated incidents of conduct). Nor do we find that defense counsel was ineffective for telling the jury that self-defense was not a defense to the mob action charges in this case. Defense counsel was merely repeating a portion of the jury instructions that the jury was going to be given, and his statement in that regard was consistent with Illinois law and the facts of the instant case. See 720 ILCS 5/7-4(a) (West 2016) (indicating that self-defense is not available to a person who is attempting to commit, committing, or escaping after the commission of, a forcible felony); *People v. Gates*, 47 Ill. App. 3d 109, 115 (1977) (pointing out that a claim of self-defense is not available to a person who is participating in a forcible felony); IPI Criminal 4th No. 24-25.10 (providing that a person is not justified in the use of force if he is committing a forcible felony). Because we have found that none of the matters cited by defendant under this issue constituted error, except for defendant's claim of inconsistent verdicts, which was

51

addressed in the previous section, we reject defendant's claim of cumulative error. See *Jones*, 2019 IL App (3d) 160268, ¶ 50; *Fultz*, 2012 IL App (2d) 101101, ¶ 54.

¶ 115                                    E. Excessive Sentence

¶ 116         As his fifth and final contention on appeal, defendant argues that his sentences for felony murder and aggravated battery with a firearm were excessive. We have already determined that defendant's conviction of aggravated battery with a firearm must be reversed and remanded for a new trial as indicated above (inconsistent verdicts). We, therefore, consider only whether defendant's sentence for felony murder was excessive. As to the sentence for that offense, defendant asserts that the trial court committed an abuse of discretion when it discounted or failed to consider at sentencing certain mitigating evidence, most notably, the fact that the jury found defendant's conduct was mitigated by defendant's sincere but unreasonable belief that he needed to fire the weapon to protect himself and/or Mayfield. Defendant asserts further that in determining the appropriate sentence, the trial court failed to properly balance the retributive and rehabilitative purposes of its punishment. For those reasons, defendant asks that we either reduce his sentence for felony murder or that we remand this case for resentencing on defendant's felony murder conviction.

¶ 117         The State argues that the trial court's sentencing decision was proper and should be upheld. The State asserts that (1) the trial court correctly found that there were no factors in mitigation that applied to defendant and (2) the trial court's sentencing decision was justified based upon the circumstances of the shooting, defendant's prior criminal history, and defendant's history of failing to successfully complete his prior terms of probation or conditional discharge. The State asks, therefore, that we affirm defendant's sentence for felony murder.

52

¶ 118     The trial court is charged with the difficult task of fashioning a sentence that strikes an appropriate balance between the protection of society and the rehabilitation of the defendant. *People v. Cox*, 82 Ill. 2d 268, 280 (1980). On appeal, the trial court's sentencing decision will not be reversed, absent an abuse of discretion. *People v. Streit*, 142 Ill. 2d 13, 19 (1991). The trial court's sentencing decision is entitled to great deference and weight on appeal because the trial court is in a far better position than the reviewing court to fashion an appropriate sentence since the trial court can make a reasoned judgment based upon firsthand consideration of such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age; whereas the reviewing court has to rely entirely on the record. *Id.* Although the reviewing court may reduce a sentence where an abuse of discretion has occurred (Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967)), in reviewing the propriety of the sentence, the reviewing court should proceed with great caution and care and must not substitute its judgment for that of the trial court merely because the reviewing court would have weighed the factors differently (*Streit*, 142 Ill. 2d at 19). It is presumed that the trial court considered any mitigating evidence, absent some indication in the record to the contrary. *People v. Franks*, 292 Ill. App. 3d 776, 779 (1997).

¶ 119     In the instant case, after reviewing the record before us, including the record for the sentencing hearing, we find that the trial court's sentencing decision was proper. In determining the appropriate sentence to impose upon defendant for the offense of felony murder, the trial court considered, among other things, the circumstances of the offense, the PSI, and the potential factors in aggravation and mitigation. As the trial court's comments indicated, defendant in this case committed a senseless act of violence and, in doing so, killed one person and injured another. Defendant had a prior criminal history, including prior crimes of violence, and was

53

subject to a mandatory sentencing add-on of 25 years because of the personal discharge of a firearm that resulted in death. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016). In the past, defendant had repeatedly failed to successfully complete his prior terms of probation and conditional discharge, and the trial court specifically found, based upon that fact and some of the facts of the shooting, that defendant's likelihood of rehabilitation was low. Although defendant asserts that the trial court should have considered as a mitigating factor the jury's determination that defendant had acted with an unreasonable belief in the need for self-defense or defense-of-others, we do not agree with that assertion and note that this court specifically rejected a similar argument in *Lefler*. See *Lefler*, 2016 IL App (3d) 140293, ¶ 31 (indicating that the appellate court was aware of no authority that would suggest that a sentencing judge was bound to apply a statutory mitigating factor that was implicated by the jury's verdict). We, therefore, find that the trial court did not commit an abuse of discretion in sentencing defendant. Accordingly, we affirm defendant's sentence for felony murder.

¶ 120                                    III. CONCLUSION

¶ 121        For the foregoing reasons, we affirm defendant's convictions and sentences for felony murder and unlawful possession of a weapon by a felon, we reverse defendant's conviction of aggravated battery with a firearm, we vacate the jury's finding of guilty of reckless discharge of a firearm, and we remand this case for a new trial on defendant's aggravated battery with a firearm charge.

¶ 122        Affirmed in part, reversed in part, and vacated in part; cause remanded.

**No. 3-19-0283**

| | |
|---|---|
| **Cite as:** | *People v. Bush*, 2022 IL App (3d) 190283 |
| **Decision Under Review:** | Appeal from the Circuit Court of Peoria County, No. 16-CF-373; the Hon. John P. Vespa, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Karalis, and Amber Hopkins-Reed, of State Appellate Defender's Office, of Ottawa, for appellant. |
| **Attorneys for Appellee:** | Jodi Hoos, State's Attorney, of Peoria (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |